IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN DOE,
      *Plaintiff*,

  v.

BRANDEIS UNIVERSITY,
ANNE-VALERIE IMPARATO, and
SONIA JURADO,
      *Defendants.*

No. 23-cv-10199

## **COMPLAINT**

## I.   **Introduction**

1.    Plaintiff John Doe[1] brings this lawsuit to seek redress for his unjust, discriminatory, and unlawful suspension by Defendant Brandeis University upon the conclusion of student disciplinary proceedings against him during the 2020-21 and 2021-22 academic years.

2.    The disciplinary proceedings at issue arose from an incident in the early morning hours of February 3, 2021. John, a sophomore, first met Jane Coe, a senior, about three days earlier. On the evening of February 2, 2021, Jane invited John to her room, picked him up in her car, and drove him to her residence, where they spent a few hours together. When John said that he wanted to leave, Jane grabbed his sweater. He asked her to give it back, but she used physical force to keep it away from

_____

[1] Plaintiff is identified herein as "John Doe" or "John," a pseudonym. Plaintiff has filed a motion to proceed under pseudonym and has also used pseudonyms for the other then-students involved, the complainant ("Jane Coe") and her suitemate ("MS"). Defendants know the identities of these students and take no position on the motion.

him. They began "play wrestling," in Jane's words, over the sweater. After only a minute or two, Jane released John's sweater, and the episode ended. She then drove him home. Text messages between John and Jane during the following week show John was surprised to learn that Jane came to believe she had been injured during the tussle over the sweater. Jane did not initiate a disciplinary complaint against John with Brandeis. But based on a biased and exaggerated second-hand report from Jane's suitemate, who was employed by Brandeis as an inadequately trained "Community Advisor," Brandeis brought an Administrative Complaint against John, conducted a biased and deficient investigation, erroneously found him responsible for "dating violence," and imposed severe sanctions, including a one-year suspension, a permanent ban on holding any office or leadership role at Brandeis or representing the University in any capacity, and a notation in his permanent academic record.

3.     In a 2016 order denying in relevant part Brandeis' motion to dismiss a different plaintiff's case, *see Doe v. Brandeis University*, 177 F. Supp. 3d 561 (D. Mass. 2016) ("*Doe v. Brandeis I*"), the court found the plaintiff student made viable claims against Brandeis for breach of contract, violation of the implied covenant of good faith and fair dealing, negligent supervision, and negligent infliction of emotional distress based on Brandeis' handling of disciplinary proceedings that resulted in a finding that a student had committed sexual misconduct. The court found that the plaintiff plausibly alleged breaches of express terms in the Brandeis Student Handbook as well as violations of Brandeis' obligation to provide "basic fairness" in its student disciplinary process. *See id.* at 598-608.

4.   The events underlying *this* lawsuit demonstrate that while Brandeis may have made certain cosmetic changes to its formal policies and procedures, many of the same fundamental legal deficiencies remain, both in its policies and procedures as well as its practices.

5.   In its disciplinary proceeding against John, Brandeis failed to comply with its own policies and procedures. Brandeis also failed to provide basic fairness in violation of its contractual obligations to John and his reasonable expectations as a student. In addition, Brandeis continues to negligently supervise its employees and agents. Brandeis and its employees, Anne-Valerie Imparato and Sonia Jurado, negligently violated their duties of care to John and negligently inflicted emotional distress upon John. Finally, Brandeis violated John's rights under Title IX to be free of gender discrimination and his rights under Section 504 of the Rehabilitation Act and Title III of the Americans with Disabilities Act to be free of discrimination on the basis of disability.

## II.   Parties

6.   Plaintiff John Doe is a citizen of New Jersey.  At the present time, he is temporarily living and working outside the United States. At all times relevant to this Complaint, he was a student enrolled at Brandeis.

7.   Defendant Brandeis University is an educational corporation organized under the laws of the Commonwealth of Massachusetts, located in Waltham, Massachusetts. At all relevant times, Brandeis received federal funding.

8.   Defendant Anne-Valerie Imparato is a citizen of Massachusetts and a licensed attorney. After graduating from law school in 2014, she spent several years

3

as a law firm associate and "dispute resolution fellow" before joining Brandeis in 2019 as an attorney-investigator in its Office of Equal Opportunity, a position she continued to hold through June 2022. She subsequently left Brandeis and is currently Director of the Office of Civil Rights and Title IX at the University of Massachusetts, Boston. According to her LinkedIn profile, one of Imparato's "particular interests" is "gender based violence," and one of her "outside activities" is "writing fiction."

9.     Defendant Sonia Jurado is a citizen of Massachusetts and a licensed attorney. Starting in 2011, she held a variety of Title IX investigation and enforcement positions at colleges and universities including Tufts, Mount Ida, and Wellesley before joining Brandeis in 2019 as its inaugural Director of the Office of Equal Opportunity and Title IX and ADA/Section 504 Coordinator, a position she continued to hold through April 2022. She subsequently left Brandeis and is currently Associate Vice President for Access and Equity and Title IX Coordinator at Emerson College.

## III.   Jurisdiction and Venue

10.    This action arises out of violations of Title IX of the Education Amendments of 1972, 28 U.S.C. §§ 1681-1688, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, as well as state law contract and tort claims.

11.    John is a citizen of New Jersey, while Brandeis, Imparato, and Jurado are citizens of Massachusetts. The amount in controversy exceeds $75,000.

12.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and § 1332 (diversity of citizenship).

13.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Brandeis, Imparato, and Jurado are located in Massachusetts and because a substantial part of the events or omissions giving rise to John's claims occurred in Massachusetts.

## IV.     FACTS

### A.     Background and February 3, 2021 sweater incident

14.     In early February 2021, when the incident at issue occurred, John was a sophomore, and Jane was a senior, both at Brandeis. The pair met on an online dating app. Beginning on January 30, 2021, they met a handful of times in person and engaged in consensual intimate activity.

15.     When they were not together, John and Jane communicated principally by text message. A compilation of all the text messages ever exchanged between John and Jane, beginning on January 31, 2021, and ending on February 9, 2021, is attached as Exhibit A (redacted to protect personal identifying information). The text messages provide overall context for their relationship, which is important to understand the actual events that formed the basis of the disciplinary proceedings against John.

16.     On January 31, 2021, starting in the early afternoon, John and Jane's text conversation comprised 40 messages from Jane and 29 from John. The texts covered a wide range of topics, including their date the night before and light-hearted comments about marks or hickeys on Jane's neck that she said had resulted from their consensual interaction. Jane invited John over to her room that night. He agreed, stating that he would want to be home before midnight. The texts ended at

7:22 pm, when Jane picked John up in her car to drive him to her room.

17.     On February 1, 2021, John and Jane's text messages comprised 34 texts from Jane and 21 from John, starting at 10:54 am and ending at 9:04 pm. Jane teased John about being pessimistic and then about his long and somewhat didactic response about the definition of "pessimism." Jane twice suggested that they get together. The first time she told John she wanted a hug. John responded a couple of hours later telling her he was busy with classes. Later, Jane again implied she wanted John to come over and, when he did not respond immediately, wrote "Yeah no response that's what I thought." This time, John, who was pursuing a dual major in linguistics and computer science, said that he had homework to do.

18.     On February 2, 2021, John and Jane's text messages comprised 44 texts from Jane and 31 from John, starting at 10:55 am and ending at 10:45 pm. In these messages, they discussed their class schedules. Jane was taking Creativity and Caring, which she described as related to her previous course, Psychology of Love, in which they learned about attachment styles and compatibility in relationships. Jane mentioned that she was concerned about getting "another concussion" if she went out in the ice and snow and then, at 3:18 pm, mentioned that she had in fact fallen on her face outside. When John failed to show as much sympathy as she would like, she complained and teased him by saying she was going to "dump" him and keep his sweatpants. At around 10:30 at night, Jane told John she did not want to drive home and "get in a cold ass fucking bed." John asked if she would like to come to his room but also told her that he would have to continue doing homework. She suggested

picking him up and going to her room, and he responded that would be ok, but he would need to bring his laptop.

19.     Soon thereafter, Jane picked John up, drove him to her room, and the two spent a few hours together there, where they engaged in consensual intimate activity.

20.     When, in the early morning hours of February 3, 2021, John stated he needed to leave and went to put on his sweater, Jane grabbed his sweater, refused to return it when asked, and used physical force to keep it away from him. They began "play wrestling," in her words, over the sweater. John and Jane are roughly the same size. As Jane used her whole body to keep the sweater from him, John briefly held Jane's arms and held her leg, while he tried to pull the sweater away from her. During the course of the play wrestling, they together bumped into various pieces of furniture. After a minute or two, Jane released the sweater, and the episode ended.

21.     At no time during the episode did Jane say she wanted John to stop or that he was hurting her. To the contrary, Jane's only words during the brief interaction were something along the lines of "just give up," which John interpreted as a taunt, consistent with their interactions up to that point, including the tone of many of Jane's text messages.

22.     After she released the sweater, Jane drove John back to his dorm. During the drive, Jane made a reference to John having "abused" her. John interpreted that as joking but told her that he didn't think it was funny. At 2:20 a.m. on February 3, 2021, after dropping John at his dorm, Jane texted John: "I know you

didn't actually abuse me and I'm not gonna tell people that. Should have clarified[.]"

Later that morning, at 11:55 a.m., John responded: "[Don't worry] I knew u weren't

serious[.]" Later that day, they exchanged text inquiries about their respective days,

but not much more.

### B.    Text messages during the ensuing week

23.    Over the course of the week following the sweater incident, John and

Jane continued to exchange text messages. The contemporaneous messages reflect

John's genuine surprise at Jane's statements that she came to believe she had been

injured while play wrestling with John. Jane's text messages acknowledge that she

never told John during the incident that he was hurting her, and accepted as genuine

John's bewilderment at hearing that she believed she was hurt.

24.    On February 4, 2021, at 5:23 p.m. Jane initiated the following text

message exchange (bracketed language in italics added to define abbreviations used

in exchange):

|  |  |
|---|---|
| Jane [5:23 PM, 2/4]: | How are you doing |
| John [6:56 PM, 2/4]: | Decent ig [*I guess*], hbu [*how about you*] |
| Jane [6:59 PM, 2/4]: | My knee hurts and I can't really bend it since the other night so I'm dealing with that |
| John [7:21 PM, 2/4]: | Oof |
| John [7:21 PM, 2/4]: | Sorry |
| Jane [7:27 PM, 2/4]: | I don't think you get it like its I probably have to go to the health center bad |
| John [7:49 PM, 2/4]: | Idk [*I don't know*] what you want me to say, you could have let go of the sweater at any time or told me that I was seriously hurting you |
| Jane [9:56 PM, 2/4]: | You didn't mean it? |
| Jane [10:18 PM, 2/4]: | I was a little scared |
| John [10:19 PM, 2/4]: | What are you asking me about not having |

|  |  |
|---|---|
| | meant? |
| Jane [10:25 PM, 2/4]: | I'm a little drunk right now idk [*I don't know*] if I should have this conversation right now |
| Jane [10:26 PM, 2/4]: | It's just because I have a trauma background so I am easily scared and go into a freeze response which is why I didn't say much when it was happening and I also just recovered from my concussion so I have to be extra careful |
| John [10:34 PM, 2/4]: | My sole motivation was to get my sweater back. I was annoyed at you for holding on to it and (in hindsight very immaturely) didn't want to 'admit defeat' by giving up, but the idea of hurting you never crossed my mind. |
| Jane [10:37 PM, 2/4]: | Ok, I think it was just a miscommunication. But I am kind of hurt |
| Jane [10:38 PM, 2/4]: | Particularly concerned about my head so I'm going to the health center tomorrow morning to make sure I'm still ok |
| John 10:42 PM, 2/4]: | I'm really sorry that I did anything to make you feel afraid or unsafe. If I had realized you felt that way I would have stopped trying to get my sweater back |
| Jane [10:43 PM, 2/4]: | Thanks for apologizing |
| John [10:50 PM, 2/4]: | Is there a way that I could tell in the future if you or someone else is going into a freeze response rather than simply being recalcitrant? |
| Jane [11:00 PM, 2/4]: | I think checking in a lot to make sure and being patient because sometimes it takes a while to verbalize it |
| Jane: [11:03 PM, 2/4] | Especially for people who have people pleasing tendencies and feel bad standing up for themselves |
| John [11:11 PM, 2/4]: | Alright noted |
| Jane [11:15 PM, 2/4]: | I'm half awake after a "party" |
| Jane [11:15 PM, 2/4]: | Of like two friends |
| John [11:16 PM, 2/4]: | Was it fun? |
| Jane [11:17 PM, 2/4]: | It was but I'm sweaty |
| Jane [11:20 PM, 2/4]: | Very tired |
| John [11:24 PM, 2/4]: | It's like 2 and a half hours past ur [*your*] bedtime do [*so*] that's understandable lol |

9

|  | [*laugh out loud*] |
| Jane [11:31 PM, 2/4]: | It really is |
| Jane [11:31 PM, 2/4]: | I'm still not even home |
| Jane [11:45 PM, 2/4]: | Lol [*Laugh out loud*] |
| Jane [11:59 PM, 2/4]: | Finally leaving |
| Jane [12:46 AM, 2/5]: | I am sometimes not good at verbalizing my needs but I think what I wanted when I took your sweater was to be held |
| John [1:00 PM, 2/5]: | That makes me feel really guilty, I'm sorry |
| Jane [5:15 PM, 2/5]: | Thanks for apologizing |

25.     Having known Jane only very briefly, John was not aware of her purported "trauma history" or that she might "freeze" rather than verbally expressing her thoughts.

26.     Moreover, just as Jane reported she experienced past "trauma" and was not "good at verbalizing [her] needs," John's circumstances made it particularly unlikely that he would understand what Jane was thinking. John suffered from social anxiety and ADHD and was not adept at interpreting social cues. He was more academically inclined than socially experienced. Adding to his social inexperience, he was two years younger than Jane and had spent most of his two years of college either at home due to the pandemic or at Brandeis under strict COVID restrictions. It did not occur to him that Jane took his sweater because she wanted "to be held." Instead, from John's perspective, Jane grabbed his sweater to prevent him from leaving her room, refused to give it back when asked, and challenged him with verbal taunts to try to take it away from her.

27.     At the beginning of the February 4 text exchange between Jane and John, quoted above, when Jane first mentioned her alleged injury to John, Jane was

simultaneously texting her suite-mate, MS, and reporting to MS on the text exchange with John. MS is the person who later reported the incident to Brandeis. Apparently, Jane had discussed with MS her intended text to John prior to sending it. When Jane described John's apology to MS, MS responded by saying she would "write him up." Jane in turn escalated her own reaction by impugning the character of *all* men.

28.     The portion of the text exchange between Jane and MS, between 7:22 pm and 9:42 pm on February 4, is as follows:

> Jane:  His Response……
> MS:    what….
> Jane:  "Oof. Sorry"
> MS:    i….
> MS:    am gonna write him up
> Jane:  I hate men
> Jane:  Men aint shit [MS]

29.     Notably, despite the side conversation with MS, Jane also continued her conversation with John and, in the course of it, acknowledged that there had, in fact, been a genuine miscommunication. Jane also took the time to explain to John about her "trauma" background and trouble with "verbalizing" her needs—conditions that may have contributed to the miscommunication.

30.     On February 7, 2021, John and Jane exchanged additional text messages, which were at times similar in tone to their messages before February 3, but also at other times, indicated that Jane was increasingly unhappy with John, specifically for forgetting it was her birthday, and more generally, for being insufficiently attentive to her. Jane accused John of wanting only a casual relationship with her and of having already forgotten their conversations. She said

that he should not assume he would see her again. John did not respond to Jane's last text on February 7.

31.    At 7:03 a.m. on February 9, 2021, for the first time since the sweater incident, John suggested meeting: "Wanna get breakfast tomorrow?" Jane did not respond. John did not send any further text messages or otherwise attempt to contact Jane.

### C.    Report by Jane's Suite-Mate, MS

32.    As noted above, by February 4, 2021, Jane had told her friend and suite-mate, MS, who was also a Brandeis student, about the sweater incident. As demonstrated in the text exchange set forth above, by that point Jane and MS had discussed John's involvement in the incident and the possibility of MS "writing him up," as well as their shared belief that the incident reflected the bad character of men in general.

33.    MS served as a Brandeis "Community Advisor." In that capacity, she acted as an employee and agent of Brandeis for various purposes, including reporting violations of Brandeis' policies and "community standards."

34.    Brandeis failed to provide MS with adequate training and failed to supervise her to ensure she acted competently, fairly, without bias, and in compliance with Brandeis' policies and legal obligations.

35.    It was not until on or about February 8, 2021—after the February 7 text exchange between Jane and John in which Jane indicated she was angry with John for forgetting her birthday, allegedly treating her casually, and not remembering their conversations, and warned she might not want to see him again—that Jane's

friend and suite-mate, MS, reported to the Brandeis Office of Equal Opportunity that John physically assaulted Jane in the early morning hours of February 3, 2021. MS's second-hand report to Brandeis distorted and exaggerated the actual events, evidenced inadequate training as a Community Advisor, bias in favor of her friend, bias against men, and a predisposition to see men as bad actors.

**D.   Brandeis' Administrative Complaint and investigation**

36.    Based on the report from MS, Defendant Sonia Jurado, Director of the Brandeis Office of Equal Opportunity and Title IX and ADA/Section 504 Coordinator, decided that Brandeis would open an investigation of the sweater incident.

37.    Brandeis purported to conduct the investigation pursuant to its Formal Complaint Process. A copy of the Formal Complaint Process in effect at relevant times is attached as Exhibit B.

38.    Brandeis assigned Defendant Anne-Valerie Imparato, attorney-investigator, to conduct an investigation.

39.    Brandeis failed to provide Imparato with adequate training and failed to supervise her to ensure she acted competently, fairly, without bias, and in compliance with Brandeis' policies and legal obligations.

40.    The investigation consisted of brief interviews with Jane, John, and MS, as well as a review of documents provided by Jane, John, and MS.

41.    Imparato made audio recordings of her interviews with Jane, John, and MS. Although written summaries were created that included partial, purportedly verbatim quotations, Brandeis did not fully transcribe the recordings. At various points during the investigation, Brandeis permitted John and his advisor to view

certain investigative materials, including the interview summaries, temporarily via an online platform that did not permit downloading or copying. However, Brandeis denied John's requests to listen to the complete audio recordings. He and his advisor have never been able to listen to the recordings of the interviews.

### E.  First "interview" of Jane on February 17, 2021

42.    Imparato conducted an initial interview of Jane on February 17, 2021, fifteen days after the sweater incident. The so-called "interview" was very short, and Imparato summarized it in a two-page document. Again, John and his advisor have never been given access to a recording of this interview.

43.    According to the summary, Jane told Imparato that John

> put his knee on my chest and choked me. He had me on the floor, and he was on top of me, and I was laying on my stomach and my arm was out and his knee was on my arm, and he was yelling at me to give him the sweater. I was like, "I can't because you're on my arm," and he was like "I want it now," and he smacked me around the place. I had a concussion from August to the end of January, and now I have another one.

44.    According to the summary, Imparato responded, "I'm so sorry." In doing so, she credited Jane's account and abdicated her own role as a "neutral" Investigator. Imparato did not ask any specific follow-up questions to clarify Jane's account, obtain a detailed chronology, or address apparent inconsistencies in Jane's initial statement (*e.g.,* if Jane was on her *stomach* and one of John's knees was on her arm, how could John have had put his knee on her *chest*?). Imparato asked no questions about Jane's pre-existing concussion or any prior mental health treatment.

45.    Rather than probe any further about what actually happened during the incident, Imparato asked Jane, "Do you feel you're getting the help you need?"

14

Imparato also offered to "talk to [Jane's] professors and get [her] and [*sic*] extension" on a writing assignment.

46.    Imparato asked Jane, "have you seen or talked to [John] since [the incident]?" Jane responded, "I talked to him over text" and went on to give a lengthy, discursive answer that mischaracterized her text messages with John. For example:

   a.   Jane falsely told Imparato that after the incident, John "kept asking if I wanted to hang out. I was like no." In fact, almost all the exchanges after the incident were initiated by Jane, and aside from a single suggestion to meet for breakfast, a week after the incident, to which Jane did not respond, John did *not* "keep asking" to "hang out."

   b.   Jane falsely claimed, "He was like . . . You should have said I was actually hurting you, and I was like, I did though, you didn't listen." In fact, Jane did not assert to John that she had said anything of the kind— instead, she had attributed her *failure* to say anything during the incident to a "freeze response."

47.    Imparato did not ask Jane to see all the text messages at that time. Moreover, even after Imparato later received selected text messages from Jane and then the complete set from John, Imparato never asked follow-up questions of Jane about her demonstrably false statements.

48.    After Imparato clarified that John was also a Brandeis student, she stated to Jane, "[t]his is a problem," which reflected her prejudgment of the case and presumption that John posed an ongoing threat to Jane or other students.

49.     Imparato asked Jane whether she "was interested in holding [John] accountable," again reflecting her prejudgment of the case.

50.     Jane responded, "I don't really want to go through a whole case against him."

**F.     Second "interview" of Jane on March 10, 2021**

51.     Three weeks later (and five weeks after the incident), on March 10, 2021, Imparato again spoke with Jane, accompanied by Jurado, who possessed authority to decide whether Brandeis should initiate an Administrative Complaint against John. Again, this interview was recorded, but John and his advisor have not been provided access to the recording.

52.     The Brandeis "summary" indicates this second "interview" lasted only 15 minutes and included no substantive discussion about the incident. Instead, the conversation focused entirely on explaining to Jane what would happen if Brandeis initiated an Administrative Complaint against John.

53.     Jurado and Imparato requested "cooperation" from Jane and described efforts that Brandeis would undertake to care for and protect Jane during the disciplinary process.

54.     Jurado explained that "as an institution we're concerned" about John "being a safety risk" and that, therefore, "we have to address it." The only question, for Brandeis, was "how involved [Jane] want[ed] to be."

55.     Jurado assured Jane that any eventual hearing would not be "in person and could be "set it up in a way that will make [her] feel safe and make her feel comfortable."

56.     When Jane expressed reluctance to go through the Administrative Complaint process, Jurado pressured her, saying "We do need to start this. It's too serious for us not" to do so.

57.     Jane stated, "he's convinced that what he did is not wrong, so you'll be met with a lot of, 'What is going on?'" Instead of fairly considering John's account and perspective, Jurado responded, "Which is part of the problem."

58.     Jurado told Jane, "You shared this information, and it's our job for us to do the process.... the heavy lifting is stuff we'll do because that's our job."

59.     As this exchange demonstrates, before anyone from Brandeis had spoken with John to get his side of the story, or interviewed any other potential witnesses, or reviewed any other evidence, Brandeis had already credited Jane's self-contradictory account and prejudged the case, concluding that John had assaulted Jane and was a "safety risk" on campus; determined Brandeis "had to address" this "risk"; and therefore, Brandeis "needed" to initiate an Administrative Complaint because the situation was "too serious." Brandeis disregarded Jane's reluctance to continue and, in fact, put her in a position where she would feel that she needed to confirm her prior statements and continue as a complaining witness, in order to do her duty and not let them down.

60.     The joint participation of Jurado and Imparato in the March 10, 2021, "interview" of Jane blurred their respective roles as a supposedly "neutral" Investigator (Imparato) and the Director, whose role was to make the prosecutorial determination whether to bring an Administrative Complaint (Jurado). This further

biased Imparato's investigation with Jurado's prejudgment.

61. Rather than focusing on finding out the truth of what happened in this incident, Brandeis focused on what Imparato and Jurado perceived to be "the problem"—"dating violence" against women—and orchestrated a process that would make Jane "feel safe" and "comfortable" while addressing the supposed "risk" posed by John.

### G. Jane's incomplete documentary evidence

62. At some point after February 17, 2021, in response to the request for "cooperation" from Imparato and Jurado, Jane provided certain documentary evidence to Imparato, including some (but not all) of her text messages with John, five photographs, and a handful of medical records from Brandeis and MGH.

63. Two of the five photographs, which all appear to have been taken at the same time, depict red marks and/or bruising on Jane's neck. One of those photographs contains a date stamp of January 31, three days *before* the sweater incident. It is unknown who took the photographs.

64. It is not clear what the three non-"neck" photographs depict, when they were taken, or who took them.

65. An Occupational Therapy progress record from MGH dated April 15, 2021, stated Jane "is being followed by the Brandeis Health Center for a possible torn ligament in her left knee" as a result of the sweater incident, apparently based on Jane's inaccurate self-report to the MGH clinician, which contradicts the Brandeis treatment records. The first Brandeis record (dated February 5, 2021) indicated only that Jane complained of "some pain in left knee." By the time of the final Brandeis

treatment record (dated February 19, 2021), there was no mention of any knee injury at all.

66.     With regard to any possible "concussion," which Jane reported to Imparato, the first Brandeis treatment record (dated February 5, 2021), two days after the sweater incident, contains no objective, neurological findings consistent with a concussion.

67.     Instead, the medical records document only treatment for self-reported concussion "symptoms" following the sweater incident. The records also confirm that Jane had recently suffered from an unrelated, prior concussion for which she had just completed a course of therapy on January 26, 2021.

68.     There is no indication in the medical records that Jane disclosed to medical personnel at MGH or Brandeis that she slipped on snow or ice and "fell on her face" earlier on the day of the sweater incident.

### H.     Brandeis Notice of Complaint on March 26, 2021

69.     On March 26, 2021, John received a Notice of Complaint signed by Jurado, which was his first notice of the allegations made against him more than a month earlier. A copy is attached as Exhibit C (redacted to protect personal identifying information).

70.     The Notice stated:

> It has been alleged that on or about February 3, 2021, you were play wrestling with a female student who you had recently started dating, which then turned violent. It is alleged that during this incident you choked the student, pinned her arm behind her head, stepped on her stomach and knee, and threw her into furniture, resulting in injuries to that student.

*Id.* Notably, this summary included allegations that did not originate in Jane's account, such as the allegation that John pinned Jane's arm behind her head, stepped on her, and threw her into the furniture. Given that John and Jane were about the same size and John is not an athlete, this last allegation was a particularly preposterous addition.

71.     The Notice advised John that he could "have a support person/advisor present at every meeting within this process," but the "support person/advisor does not join in any of the conversations that are the subject of a meeting and does not speak on your behalf, but instead provides support for you through their presence." *Id.*

## I.     John's written response to the Notice of Complaint

72.     Later on March 26, 2021, without the assistance of his parents, counsel, or any other advisor, John emailed Imparato:

> I would also like to share my perspective on the incident that is the subject of this investigation.
>
> After having spent a few hours together, I had said that I wanted to leave and went to pick up my sweater. [Jane] grabbed my sweater and refused to give it up. This resulted in a struggle during which I attempted to wrest the sweater from [Jane's] hands and [Jane] attempted to maintain her hold on the sweater, using her arms and legs to hold and pin down my sweater such that I couldn't take it from her. In order to stop her from doing so, I did pin her arms and hold down her leg. I would like to make clear that I didn't 'step' on her knee. I pinned it such that she couldn't hold the sweater between her legs. I do not recall having stepped on her stomach or having applied any pressure to her torso in any way. I do not recall throwing her against furniture. I absolutely did not choke her, the idea of me choking her makes me sick. I stopped pinning her immediately after she let go of the sweater, after which she drove me to my dorm.

I want to be very clear that [Jane] neither indicated being in pain to me nor told me to stop pinning her. The only words that I remember us exchanging during this event were her telling me something along the lines of 'just give up' and me telling her firmly to not bite the sweater. I interpreted 'just give up' as being a taunt rather than a serious request for me to stop pinning her due to the tone in which it was delivered. I accept that I inadvertently injured her, but I only realized this after she informed me later.

I also want to be very clear that nothing that I did during this event was motivated by a desire to inflict any sort of pain on [Jane]. I was purely motivated by attempting to get my sweater back. I did not do anything that was intended to cause her harm or pain of any sort. She could have let go of the sweater at any time and I would have stopped pinning her. This is not to blame her for any injury that I may have caused her, but to underscore that I was not at all interested in harming her or causing her pain in any way. I am confident that [Jane] believes this as well.

**J.     First "interview" of John on March 30, 2021**

73.     Imparato first interviewed John on March 30, 2021, and her "summary" filled nine single-spaced pages.

74.     At the time of the interview, John had not yet been able to retain an advisor to assist or accompany him.

75.     During the interview, Imparato falsely assured John:

To be clear, I am a neutral investigator, so all that I do is I collect all the information from everyone, from you, from [Jane] from any relevant witnesses, and I write it in a report…. At no point in time is that about my impressions on who's right or who's wrong or anything like that.

76.     As Imparato knew, Section VI.G. of the Formal Complaint Process provided that the Investigator "may draw conclusions regarding the credibility of statements by the Complainant, Respondent, [and] witnesses." In this case, Imparato did, in fact, draw unsupported conclusions regarding credibility in her report.

77.    From the start, Imparato's interview of John was markedly different in tone and content from her interviews of Jane, reflecting Imparato's bias against John in particular, male students in general, and prejudgment of the incident.

78.    Imparato asked John a lengthy series of directed and specific questions about his relationship with Jane and the events on February 2 and 3, 2021.  Imparato also asked John to comment on the photographs and a misleading subset of text messages that Jane had selectively provided to Imparato.

79.    John cooperated with Imparato and answered all her questions truthfully and completely, to the best of his ability.

80.    Imparato confronted John with embellished and exaggerated "facts" about the sweater incident that she falsely attributed to Jane, but which were absent from and/or inconsistent with what Jane actually told Imparato, according to Imparato's interview summaries and Jane's contemporaneous text messages with John. For example:

   a. Imparato falsely told John that Jane "said that during the incident she told you that you were hurting her, that she was crying and that she had made it clear that she was in pain, and that when you said, 'how was I supposed to know that you are in pain?' She said at the time, 'Well, I was crying.' So I want to share with you that is what she said." John responded: "That's not in my memory at all." There is no evidence that Jane made those statements to Imparato, and they do not appear in the texts.

b.  Imparato showed John photographs of Jane's neck that Jane had submitted and stated, "She says that you strangled her, you choked her, you slammed her against the wall, you slammed her against the floor, and this is one of the images that she has of the bruising on her neck. Can you see that?... Do you have any comment on that?" When John said the photo depicted "hickeys" on Jane's neck that existed prior to the sweater incident, Imparato responded, "I wouldn't know that, but she says that that is from the physical altercation, she didn't say that that was from hickeys or anything."

**K.    John's April 9, 2021 email to Imparato and submission of text messages**

81.    On April 9, 2021, John sent the following email to Imparato, along with all the text messages that he and Jane had exchanged:

> I thought it would be helpful for you to have all of my text messages back and forth with [Jane], to see the full context and chronology. The attached PDF contains a complete export with time stamps.
>
> Also, I read on the Brandeis website that students can seek to resolve complaints through an informal process. I would welcome the opportunity to participate in such a process with [Jane] (through the OE Office) if that is a possibility.

82.    Later that same day, Imparato acknowledged receipt of John's email and the complete collection of text messages, which Jane had not provided and Imparato had not requested.

83.    The complete text messages were completely consistent with John's account of the events and also corroborated his account in key ways, specifically by

confirming, among other facts,  that while they were play wrestling, Jane didn't ask

John to stop or say he was hurting her; the marks on Jane's neck existed prior to the

incident; Jane had a prior concussion; and she had slipped and fallen on her face

earlier on the day of the incident. Finally, the text messages revealed that Jane's

description to Imparato of her texts with was completely inaccurate. However,

Imparato never followed up with either John or Jane regarding the inconsistencies

between the contemporaneous texts and Jane's and MS's later, conflicting accounts

of what happened.

84.     Regarding possible "informal resolution" pursuant to Section V of the

Brandeis Formal Complaint Process, on April 23, 2021, Jurado responded by e-mail:

> I am writing in response to the request you submitted to the
> investigator about the possibility of pursuing an informal
> resolution in this matter.  As you know, this matter is moving
> forward as an administrative complaint, meaning that the
> University has brought forward the complaint, not [Jane].  The
> University is not interested in pursuing an informal resolution.
> As such, the investigation in this matter will continue to move
> forward.

A copy of the e-mail is attached as Exhibit D (redacted to protect personal

identifying information).

85.     On information and belief, Brandeis never inquired whether Jane,

herself, might prefer to pursue an informal resolution. For its part, Brandeis was "not

interested" in pursuing informal resolution due to its bias against men accused of

"dating violence" and its desire to be perceived as vigilant in protecting women,

regardless of the facts or interests of parties involved in an incident. Moreover,

Jurado's response to John's request was necessarily tainted by the Notice of

Complaint, the facts of which did not match Jane's account of what happened, and included several wildly embellished additions, including that John stood on Jane, pinned her arm behind her head, and threw her into furniture.

### L.   "Interview" of MS on April 12, 2021

86.     On April 12, 2021, for the first time, Imparato spoke with MS, who did not observe the sweater incident between Jane and John but nevertheless had reported it to Brandeis in her capacity as a Community Advisor more than two months previously.

87.     Imparato asked MS whether she heard any voices during the incident. MS responded:

> It was pretty quiet beyond just like furniture. It felt like furniture is being moved around. Basically, that's the best I could have described it as. But I didn't hear any speaking, except for I think when they were leaving I guess I heard them talking about leaving.

88.      Imparato asked, "Are you usually able to hear what's going on in her room? Like how close are your rooms?"  MS responded:

> So we have — one wall is shared, so it depends on the volume of people in the room. So if it's quiet, I really can't hear too much. But if it's like a higher volume I would be able to hear what she's saying and vice versa.

89.     MS then continued with an entirely new, unsupported, and bizarre claim:

> So it was very quiet and I assume I know why it was she was not in a position to be able to speak based on what she told me. Because she said that he was briefly standing on her like vocal cords.

Imparato responded, "Right," even though the implausible claim about "standing on

her like vocal cords" had never been made by MS or Jane and was absent from the medical records Jane provided.

90.    Later, Imparato asked MS to recall whatever she could remember about what Jane told her after the incident. In her response, MS described Jane telling MS about the same "freeze response" that Jane described to John. MS stated that Jane told her that she

> froze up since she has some previous experiences with this, so she had like a freeze response and couldn't say anything like stop, but she tried to, she was frozen.

91.    Imparato never followed-up with either MS or Jane about the false claim about John standing on Jane's vocal chords, which was inconsistent with both Jane and John's accounts, and also inconsistent with the alternative claims made by MS herself in the interview that (i) that Jane was crying and told John to stop and (ii) Jane was unable to say anything because she was experiencing a freeze response.

92.    With respect to Jane's alleged injuries, MS's statements contradicted Jane's allegation that she experienced a concussion. MS stated: "I don't think that it was a concussion but there was a neck injury and a torn knee." MS also acknowledged that Jane had, "hickeys... and I think bruises also," before the sweater incident, consistent with John's statement and the dated photograph.

93.    MS agreed to email to Imparato copies of selected text messages between MS and Jane (but not a complete record). After receiving those text messages, Imparato never followed-up with Jane or MS about the "I hate men" and "Men aint shit" messages that Jane sent to MS on February 4, 2021, four days before MS

reported the incident to Brandeis. Imparato also failed to ask for MS's comment on any of the details revealed in John's account or the text messages between John and Jane. Finally, Imparato never asked MS why MS waited until February 8 to report the incident.

**M.    "Interview" of John on May 27, 2021**

94.     Imparato met again with John on May 27, 2021. Imparato told John, "the point of our conversation today is really for me to share with you the information that I've gathered so far in the investigation . . . This is really just an opportunity for you to hear everything."

95.     Imparato orally conveyed a selective description of her interview of MS, the contents of medical records that Jane had provided, and showed certain photographs that Jane provided which appeared to depict red marks or bruising on her neck. Imparato stated her "understanding" was that the photos were taken "either that night [of the incident] or the next morning," despite the date stamp on at least one of the photographs of January 31, 2021, three days prior to the incident.

96.     John inquired whether Brandeis would have an independent expert look at the photographs to determine whether the marks and bruising were consistent with "hickeys" rather than handprints or choking.

97.     Brandeis subsequently informed John that it would not obtain independent expert input but that he could retain an expert at his own expense if he wished.

**N.    Third and final "interview" of Jane on June 3, 2021**

98.     On June 3, 2021, Imparato conducted another "interview" with Jane.

Once again, Imparato did not ask Jane to provide a complete chronological account of what happened, nor did Imparato ask specific follow-up questions to clarify details of Jane's account or address inconsistencies in the information gathered to date.

99.    Instead, Imparato orally conveyed a selective summary of what John and MS had said during their interviews. Unlike her interview with John, in this case, Imparato sought Jane's reaction to John's account and asked leading questions to bolster Jane's story.

100.    After Imparato read John's narrative from his March 26 email, Jane responded with an entirely new claim:

> He is lying. That's not true. That's really all I have to say. I said multiple times that he was hurting me and he was like, give me my sweater. I was like, if you move, I will. But he was on top of me, standing on me, so that won't happen.

101.    Imparato asked: "You did tell him that he was hurting you at the time?" Jane responded: "I told him, like, 'I'll let go of the sweater if you get off of me.' He was like, 'I can't' and I was like, 'You're hurting me, get off.' He was like, 'No.'"

102.    Imparato then tried to further coach Jane, "I specifically asked him if you asked him to stop at any point. He said no. I asked him if you were crying at any point. He said no because I remember you told me that you were crying at some point, right?" In response, Jane then contradicted her previous statements and confirmed John's account. Jane said: "I was like, I just went silent." At that point, without establishing the relevant facts, Imparato simply moved on.

103.    During the interview, Jane also backed away from any claim that John choked her with his hands, and this development surprised Imparato, who asked,

"The night of February 3rd, he didn't choke you?" Jane responded with another entirely new claim: "There's one point where he got the sweater like I think it was the arm of the sweater – like around my neck and was like pulling it." Imparato responded, "Ok. That's good to know." Imparato did not inquire why Jane had never previously claimed to have been "choked" by the sweater. She also did not ask questions about the photos that Jane had submitted of alleged marks from the incident, one of which was date-stamped three days prior to the incident.

104.    Imparto also told Jane, "[John] actually ended up sending me all of the text messages between you and him." Imparato assured Jane that the text messages were "not relevant except for the ones you've already seen," despite the fact that the full set of texts corroborates John's account and was inconsistent with Jane's.

105.    Near the end of the interview, Imparato told Jane, "I know it's really difficult talking through all this stuff. I mean, this is usually the hardest part. But you got through it, we're done." Imparato added, "Take care of yourself for the rest of today. Forget this conversation ever happened. Get some rest, and I will be in contact soon."

106.    In her conduct of the interview, Imparato failed to ask basic questions relevant to the investigation or to probe the inconsistencies within Jane's statements and between Jane's statements and the other evidence. Demonstrating Imparato's bias against John in particular and men in general, Imparato's questions and demeanor were plainly intended to bolster items from Jane's account that supported the judgment that Imparato had already reached. Imparato showed no interest in

facts or statements that did not support that outcome.

**O.    Draft Investigative Report**

107.    On August 30, 2021, Imparato issued a Draft Investigative Report. The Draft Report, along with materials intended to support it, such as interview summaries, redacted medical records, and photos, were temporarily made available to John and his advisor via an online platform that did not permit downloading or copying.

108.    The Draft Report did not accurately or objectively summarize the available evidence. It completely misread the medical records, erroneously characterized certain facts as "undisputed," and unjustifiably explained away substantial inconsistencies in Jane's statements.

109.    For example, the Draft Report proposed as a "finding" of "undisputed fact":

> The medical reports indicate that [Jane] suffered a concussion and torn knee ligament due to the incident. [John] did not dispute these reports.

In fact, the medical records did *not* support the conclusion that Jane suffered a concussion or torn knee ligament as a result of the incident. The medical records showed only that Jane herself reported she thought she had a torn ligament and concussion. And while John did not dispute the existence of the records, he was never asked whether he agreed with Imparato's erroneous interpretation of those records.

110.    In addition, the Draft Report made baseless, conclusory findings that Jane was more credible than John, despite the considerable record to the contrary.

111.    Crucially, the Draft Report artificially broke down the fluid, minutes-

long interaction between Jane and John into four discrete "issues to be decided" by a

Title IX Hearing Panel:

> 1. [John] stated that he pinned [Jane] to the ground and was wrestling with her on February 3, 2021.
>> a. Did [John] engage in "physical abuse" that constitutes Dating Violence as defined in Section IV, D, 3, b of the Policy [Against Discrimination, Harassment and Sexual Violence]?
>
> 2. Did [John] slam or push [Jane] into various items of furniture on February 3, 2021?
>> a. If you find [John] slammed or pushed [Jane] into various items of furniture, did [John] engage in "physical abuse" that constitutes Dating Violence as defined in Section IV, D, 3, b of the Policy?
>
> 3. Did [John] wrap his sweater around [Jane's] neck and choke her with it on February 3, 2021?
>> a. If you find [John] wrapped his sweater around [Jane's] neck and choked her with it, did [John] engage in "physical abuse" that constitutes Dating Violence as defined in Section IV, D, 3, b of the Policy?
>
> 4. Did [John] put his knee into [Jane's] arm and chest on February 3, 2021?
>> a. If you find [John] put his knee into [Jane's][ arm and chest], did [John] engage in in "physical abuse" that constitutes Dating Violence as defined in Section IV, D, 3, b of the Policy?

112.    John submitted detailed responses to the Draft Report on September 17,

2021, pointing out its flaws and inaccuracies.

113.    For example, with regard to the Draft Report's description of Jane's

purported injuries, John pointed out that:

> The medical reports do not indicate that [Jane] "suffered a concussion and torn knee ligament due to the incident."
>
> First, the available documents do not reflect any actual

diagnosis of a "torn knee ligament" or even any testing to identify such an injury. The Brandeis records (2/5/2021) indicate only that [Jane] complained of some "pain in left knee." By the time of the final Brandeis record (2/19/2021), there is no mention of any knee injury at all. The MGH records state that [Jane] "is being followed by the Brandeis Health Center for a possible torn ligament in her left knee," apparently based on [Jane's] self-report to the MGH clinician. This apparent self-report is not consistent, however, with the available Brandeis records

Second, while the medical records reflect treatment for self-reported concussion symptoms following the incident, the records also confirm that [Jane] had recently suffered an unrelated, prior concussion, for which she had just completed a course of therapy on January 26, 2021.  In addition, in a text exchange at 3:18 p.m. on the afternoon of February 2, [Jane] mentions "falling on [her] face in the snow."

The records do not establish whether any new reported symptoms resulted from a continuation or re-aggravation of a prior injury or a "new" concussion, nor do they establish the cause of any new concussion-type symptoms. The reference to a "new" concussion in the MGH records contained in the "history" section is also apparently based only on [Jane's] self-report, not any actual medical differential diagnostic finding. As noted above, the pertinent (neurological) elements of the "Objective" section of the first Brandeis record (2/5/2021), two days after the incident, do not contain any findings consistent with a concussion.

114. With regard to the Draft Report's references to photographs Jane provided, John stated:

> It should be noted that only one photograph contains a date stamp (January 31, prior to the incident at issue).  The dated photograph depicts neck bruising and appears to have been taken at the same time as the only other photograph depicting neck bruising.  The other three photographs are not dated, and it is not clear what they depict.

115.   With regard to the Draft Report's "credibility assessment," John stated:

I object to the conclusory, general credibility assessment in this section of the draft report.  While Section VI.G. of the Brandeis Formal Complaint Process permits the Investigator to "draw conclusions regarding the credibility of statements by the Complainant [and] Respondent," the draft report does not identify particular statements deemed credible or not credible.  Nor does it explain the basis for those judgments.

In order to address credibility "findings" in a meaningful way, I would need to understand what specific "consistencies" and "inconsistencies" the Investigator found to be significant. I also object to any credibility assessment that is made without an opportunity for my lawyer to cross-examine witnesses. At a minimum, I would like an opportunity to respond in writing to a more substantive explanation of the basis for the Investigator's credibility findings.

As a general matter, I would note that apparent "consistencies" between [Jane's] account and documents and/or statements by MS are not surprising because the available records and MS's statements are nearly all derived from what [Jane] told MS and medical providers, respectively.  The fact that my memory of events is in various ways different from [Jane's] accounts (whether direct or derivative) does not make my account less credible. Even if my memory may be imperfect or mistaken in some respects, I have always tried to be candid and never intended to mislead the investigator.

I have identified numerous inconsistencies between statements by [Jane] and available evidence elsewhere in this submission.  Here are a few additional examples:

[Jane's] claims that I was "yelling" at her to give up the sweater and that she told me that I was hurting her are inconsistent with MS's statements that she would have been able to hear "higher volume" voices from the other room and also inconsistent with [Jane's] own statement that she didn't say anything because she had a "freeze

33

response."

[Jane] also claims that, after the incident, "He kept asking if I wanted to hang out. I was like no." This statement is false, as documented in the contemporaneous text messages that [Jane] sent. More generally, [Jane's] claims that she was in fear after the incident are inconsistent with her text messages.

116.   With regard to the proposed "Issues to be Decided," John stated:

While the Brandeis Policy does not define "physical abuse," a common-sense definition, consistent with the Massachusetts laws cited in the Appendix, would be the intentional infliction or attempted infliction of physical harm. It cannot reasonably be understood to include inadvertent or accidental infliction of physical harm.

I did not intend or attempt to cause any physical harm to [Jane], and there is no evidence that I meant or tried to hurt her. Again, I am very sorry for any distress she may have experienced, but that was never my intent.

[Jane] initiated the incident at issue when she grabbed my sweater and physically kept it away from me, even after I asked her to let go. The entire interaction lasted for a matter of minutes. I object to the breakdown of this brief and fluid event into four separate questions (with additional sub-questions) because context is lost. To be properly understood the incident must be considered as a whole.

VII.1.  [Jane] herself described the inception of the incident as "play wrestling" that she initiated. It ended when she released my sweater. Again, I did not intend or attempt to cause physical harm.

VII.2.  I did not slam or push [Jane] into various items of furniture. To the extent it was caused by me, any contact with or bumping of furniture was incidental and not intended to cause physical harm.

VII.3.  I did not wrap my sweater around [Jane's] neck and choke her with it. She never mentioned being "choked" with

a sweater (in interviews, text messages, or medical records) until June 3, 2021, months after the incident. Even her statement at that time only claims that I pulled the sweater while it was around her neck, not that I intentionally "wrapped" it around her neck to choke her. The photographs from January 31 show neck bruising in the form of hickeys and/or a handprint several days prior to the incident. The medical records describe the bruising in the same way and do not mention any marks consistent with the abrasions or pattern that a sweater might leave.

VII.4.   I did not put my knee into [Jane's] arm and chest. No evidence corroborates this claim. All of our physical contact, when I was trying to get my sweater back, was brief, fluid, and not intended to cause physical harm.

**P.   Final Investigative Report**

117.   Imparato issued the Final Investigative Report on October 15, 2021. The Final Report was temporarily made available to John and his advisor via an online platform that did not permit downloading or copying.

118.   The Final Report was identical to the Draft Report, except that it added two sentences: "[John] noted in his response to the Draft Report that only one of the photographs [Jane] provided contains a time stamp (January 31, 2021). [John] noted this timestamp pre-dates the incident at issue, which occurred in February." In all other respects, the Final Report ignored John's comments and objections. The Final Report even falsely continued to describe as "undisputed" certain facts that John had expressly disputed in his response.

119.   Imparato's failure to correct objectively unsupported findings in the Final Report and her fragmented framing of "issues to be decided" tainted both the Hearing Panel's decision and the Dean's Office determination of sanctions. Those failures further evidence Imparato's bias against John from the inception of the

proceedings.

**Q.   Title IX Grievance Process Hearing**

120.   On November 8, 2021, more than nine months after the incident and eight months after the Notice of Complaint issued, Brandeis conducted a Title IX Grievance Process Hearing.

121.   A Decision-Making Panel, comprised of one outside contractor, Kelly Gallagher of Grand River Solutions, acting as chairperson, and two Brandeis employees, Kimoi Seale and Maric Kramer, presided over the November 8 hearing. Imparato and Jurado also attended the hearing.

122.   Brandeis retained and paid for an attorney to assist Jane as her "advisor" at the hearing.

123.   John retained and paid for his own advisor, but at the hearing, his advisor was prevented from asking relevant questions to explore bias, motivation, and credibility.

124.   For example, while the chairperson permitted John's advisor to ask questions of Imparato to establish that she did not take certain obvious steps to obtain and convey information accurately (*e.g.*, Imparato failed to correct or address certain objections to the Draft Report, Imparato never asked Jane whether Jane actually suffered a torn knee ligament, and Imparato never sought to establish the dates of each of the photographs provided by Jane, at least one of which, and likely all of which, pre-dated the sweater incident), the chairperson did not permit John's advisor to inquire *why* the Investigator failed to do those things. The chairperson's erroneous finding that questions probative of Imparato's bias, motivation, and credibility were

not "relevant" tainted the hearing and impaired the reliability of the Panel's determinations.

125.   When questioned by John's advisor at the Hearing, Jane admitted that she did not, in fact, suffer a torn knee ligament. When asked why she had not corrected this erroneous proposed finding in the Draft Report, Jane responded in substance that she had not read the Draft Report. Jane's advisor, a licensed attorney with a duty of candor to tribunals before which she appears, also had failed to correct the misleading record regarding Jane's supposed injury.

### R.   Notice of Outcome and Administrative Appeal

126.   On December 16, 2021, Brandeis issued a Notice of Outcome, signed by Alex Rossett, Assistant Dean of Student Rights and Community Standards. A copy of the Notice is attached as Exhibit E (redacted to protect personal identifying information).

127.   The Notice included the following summary of allegations:

> [Jane] alleges that in the early morning hours of February 3, 2021, [John] physically assaulted her while in her dorm room…. [Jane] stated that she and [John] had been spending time together that evening, and when [John] went to leave, [Jane] jokingly refused to give him his sweatshirt back. [Jane] stated [John] became aggressive with her, pinning her to the ground and slamming her against various pieces of furniture such as her desk, dresser, and bed and choking [Jane] with the sweater. [Jane] stated she told [John] several times that he was hurting her. [Jane] alleges she suffered a torn ligament in her knee, various bruises, and was re-concussed due to the incident with [John].

128.   The Notice did not acknowledge that certain allegations contained in the summary were definitively *disproven*, for example, that Jane *admitted* she did not

suffer a torn ligament in her knee.

129.    According to the Notice, the Panel found John "responsible" for the

following:

> 1. It is undisputed that [John] stated he pinned [Jane] to
> the ground and was wrestling with her on February 3,
> 2021. While it is also undisputed by the parties that the
> encounter began playfully, at a certain point it became
> excessive to the point of violence and [Jane] suffered
> physical harm as a result of the encounter. The Decision-
> Making Panel finds, by a preponderance of the evidence,
> that through this conduct [John] engaged in "physical
> abuse" that constitutes Dating Violence as defined in
> Section IV, D, 3, b of the Policy.
>
> 2. The Decision-Making Panel finds it is more likely than
> not that [John] slammed or pushed [Jane] into various
> items of furniture on February 3, 2021. [Jane] was
> consistent in describing the incident with the witness [MS]
> and with medical professionals. At the hearing, the [John]
> described their bodies making contact with the bed and
> witness [MS] described hearing the sounds of furniture
> moving that evening. While it is undisputed by the parties
> that the encounter began playfully, at a certain point it
> became excessive to the point of violence and [Jane]
> suffered physical harm as a result of the encounter. The
> Decision-Making Panel finds, by a preponderance of the
> evidence, that through this conduct [John] engaged in
> "physical abuse" that constitutes Dating Violence as
> defined in Section IV,D,3,b of the Policy.

130.    Demonstrating that the Panel had at least some questions about Jane's

credibility, it found "insufficient information to determine that [John] wrapped his

sweater around [Jane]'s neck and choked her with it" or that he "put his knee into

[Jane]'s arm and chest."

131.    Based on those findings, the Dean of Students Office imposed sanctions

on John, including a minimum one-year suspension, until no earlier than December

31, 2022, at which time John would have to seek approval for reentry to the University. The sanctions also included a ban on holding any office or leadership role at Brandeis or representing the University in any capacity. The sanctions would be part of John's official academic record.

132. John filed an administrative appeal on January 6, 2022, setting forth certain procedural defects in Brandeis' disciplinary process and also alleging the University's violation of John's own rights under Title IX, by asking the question of what action Brandeis would have taken against Jane if their roles had been reversed—if a senior male student was entertaining a sophomore female student in his room, grabbed her sweater to prevent her from leaving, and then complained that he twisted his knee and aggravated a pre-existing concussion in an ensuing tussle over the sweater. A copy of the appeal is attached as Exhibit F (redacted to protect personal identifying information).

133. On May 19, 2022, in a Notice of Outcome of Appeal containing the findings of a University Appeal Board, Brandeis summarily denied the Appeal. A copy is attached as Exhibit G (redacted to protect personal identifying information). The Notice did not meaningfully engage any of the substantive or procedural deficiencies John raised, nor did it address the violation of John's rights under Title IX.

**S.      Brandeis violated fundamental fairness and its own policies in the investigation and decision-making process.**

134. In her capacity as Director of the Office of Equal Opportunity and Title IX and ADA/Section 504 Coordinator, Jurado had the responsibility and authority to ensure investigations and adjudications complied with Brandeis policies, relevant

law, and fundamental fairness.

135. According to the Brandeis Title IX Grievance Process in effect at relevant times, Process is "jurisdiction[ally]" limited to "conduct... [that] fall[s] within one of the definitions of Title IX Sexual Harassment/Violence under the Policy." A copy of the Title IX Grievance Process is attached as Exhibit H.

136. According to the Brandeis Policy Against Discrimination, Harassment, & Sexual Violence, the definition of "Title IX Sexual Violence" comprises "Sexual Assault, Dating Violence, Domestic Violence or Stalking." "Dating violence," in turn, "can include verbal, physical, emotional or psychological abuse .... [and] includes ... sexual or physical abuse." A copy of the Policy in effect at relevant times is attached as Exhibit I.

137. While the Policy does not define "physical abuse," a common-sense understanding, consistent with the Massachusetts definitions cited in the Appendix to the Policy, requires the intentional infliction or attempted infliction of physical harm and does not include inadvertent or accidental infliction of physical harm, even if such harm resulted from negligence or recklessness.

138. The Panel did not find that John intended or attempted to cause any physical harm to Jane, and there was neither any allegation nor evidence that John intended or attempted to hurt Jane. Accordingly, there was no jurisdiction for a Title IX proceeding.

139. Section IV.A. of the Formal Complaint Process provides that the investigation should be "prompt, equitable, fair, thorough, and impartial." As the

foregoing paragraphs demonstrate, the process in John's case was deficient on all these measures.

140.    The process in this case was far from prompt. Jane was not interviewed until 2 weeks after the incident. John was not interviewed until almost 2 months after the incident. The only other witness, Jane's friend and suite-mate, MS, was not interviewed until even later. This inexplicable failure to promptly interview witnesses resulted in a lack of fresh and untainted accounts in the record.

141.    Moreover, despite the fact that there were only three witnesses and a small volume of documents, and despite the fact that John complied with the tight deadlines imposed on him in each case to appear for interviews and respond to written reports, the Investigator's Draft Report was not issued until August 30, 2021, and the Final Report was not issued until October 15, 2021.  The Title IX Hearing did not occur until November 8, 2021, more than nine months after the incident on February 3, 2021, and nearly eight months after the Notice of Complaint issued on March 26, 2021. With the investigation still pending at the end of the summer of 2021, it was not realistic for John to return for a potentially disrupted fall 2021 semester, and he was forced to take a leave of absence for that term.

142.    The process in this case was not equitable. Even when Imparato finally sought John's account of events, two months after the event, she proceeded to ignore his account and the evidence that supported it. In contrast, Imparato went out of her way and encouraged Jane to conform her account to what Imparato wanted to hear and had already decided. And, while Brandeis devoted attention and resources to

ensuring that Jane felt safe and supported, Brandeis made no effort to accommodate John or to consider how he might need to be supported in the circumstances. In its investigation and determination of sanctions, Brandeis paid no attention to John's record or his mental health history.

143.    Moreover, based on the facts that John and Jane both reported to investigators, Jane violated Brandeis' Policy Against Discrimination, Harassment & Sexual Violence. Under section V.C.4 of the Policy, "coercion" occurs "when continual pressure is used to compel someone to engage in sexual activity or other unwanted conduct." Moreover, Section V.C.1 of the Policy provides that "restraining someone" or "not allowing someone to leave" are acts of "physical force," particularly when used "to cause or make someone engage in sexual activity they would not otherwise have agreed to, or did not want to engage in." Jane took John's sweater to coerce him to stay in her room, and she engaged in "play wrestling" with him, even after he told her he wanted to leave. Jane admitted in the text messages that she took John's sweater, to keep him from leaving, because she wanted "to be held." She effectively coerced him into physically engaging with her when he did not want to. so Had the shoe been on the other foot—and a *male* student attempted to coerce a female student to continue to engage with him physically, after she stated she wanted to leave his room, by taking her sweater on a cold night in February—Brandeis surely would have taken that allegation seriously. Yet when investigators became aware of Jane's conduct, Brandeis neither filed an Administrative Complaint against Jane, nor encouraged John to do so, nor even advised him of his right to file his own complaint.

Further, Jane's admitted misrepresentations about the "torn knee ligament" were never investigated, even though they violated Section VI.B of the Formal Complaint and should have resulted in a "separate disciplinary action."

144.   The investigative process in this case was not thorough. Imparato *never* conducted what could fairly be described as a comprehensive, neutral interview of Jane. She repeatedly failed to request a complete chronology, any background information, or complete records. Imparato repeatedly failed to return to inconsistencies in the witnesses' accounts, instead dismissing evidence that went against her prejudged conclusion. Imparato's Draft Report contained numerous mistakes about key facts, which Imparato failed to correct in the Final Report, even after John and his advisor called them to her attention. To make matters worse, at Title IX Grievance Process Hearing, John's advisor was not allowed to ask pertinent questions that would have helped to correct and complete the record. At the sanction phase, Brandeis made no inquiries into John's record, disability, or general situation. Finally, Brandeis summarily dismissed John's administrative appeal without any engagement with the grounds set forth.

145.   The process in this case was neither fair nor impartial. From the beginning of the investigation, and well before John was notified of any complaint, the Investigator (Imparato) and the Director of the Brandeis Office of Equal Opportunity (Jurado), whose jobs were to determine whether to move forward with the process, both demonstrated bias in favor of a final determination that John engaged in "dating violence." That bias is evident in the Notice of Complaint itself,

which *added* several extreme and incendiary allegations to what Jane herself claimed to have happened. Imparato and Jurado pressured Jane into cooperating with the process; meanwhile, they misled John about their roles and their predetermined intent to find him at fault; and they refused to reconsider their assumptions, even in the face of Jane's reluctance to proceed, and even when confronted with contrary evidence. The Hearing Panel determination and sanction decision by the Dean of Students were necessarily infected by the bias of Imparato and Jurado, especially as that bias is manifest in the Final Report and even in the framing of the questions to be decided by the Hearing Panel.

146.   On information and belief, Jurado had a habit and practice of actively intervening in disciplinary proceedings at Brandeis, even though the investigative and adjudicative functions are supposed to be impartial and independent. Specifically, Jurado had a habit and practice of communicating about the merits of cases with investigators during investigations and making extensive written revisions to investigators' Draft Investigative Reports and Final Investigative Reports. Jurado also had a habit and practice of engaging in extensive, substantive *ex parte* communications about cases with Hearing Panel members, including during Hearing Panel deliberations, and making extensive written revisions to Hearing Panel findings. Jurado also had a habit and practice of instructing Hearing Panel members to delete all notes they may have made in the course of their work, to ensure that the only record that remained was consistent with the Hearing Panel's final decision. Jurado also had a habit and practice of communicating about the merits of

cases with Dean of Students representatives to influence the determination of sanctions to be imposed. Finally, Jurado had a habit and practice of engaging in extensive, substantive *ex parte* communications about cases with University Appeal Board members and making extensive written revisions to University Appeal Board findings.

147.   On information and belief, Jurado acted consistently with her habits and practices in John's case, tainting the process with her bias and prejudgment at every step.

148.   Section VI of the Formal Complaint Process specifically provides that the Investigator, who will be "responsible for gathering information regarding the allegations," will "not have a conflict of interest or bias." As set forth above, through her words and conduct, Imparato exhibited bias from the start, violating the Formal Complaint Process, and tainting the Panel's decision and the Dean's determination of sanctions.

149.   Section IV.G. of the Formal Complaint Process specifically provides that the Investigator will issue a Draft Report, provide an opportunity for the parties to submit written "comments," and "address those comments as they deem appropriate, at their discretion." As set forth above, without explanation, Imparato failed to address any of John's responses to the Draft Report; to explain her "credibility" findings in the Draft Report; or to correct the demonstrably false representation in the Draft Report that it was "undisputed" that Jane "suffered a concussion and torn knee ligament due to the incident." These failures violated the Formal Complaint

Process, constituted an abuse of discretion, and tainted the Panel's decision and the Dean's determination of sanctions.

150.    Section IV of the Grievance Process specifically provides that "written findings by the Panel will outline any factual determinations made, any credibility assessments from the Hearing, and the rationale used to reach the finding." Here, the Panel's written findings did not contain a complete or coherent factual account of what happened during the incident and, instead, were limited to answering the four flawed, contextless questions proposed (and retained over John's objection) in the Final Report. The Panel also did not explain what "physical harm" it believed Jane experienced as a result of the incident. The Panel's written findings failed to address numerous objections to the disputed and unsupported assertions of "fact" in the Final Report. Nor did the Panel's written findings contain the required credibility assessments or explain its rationale to conclude, based on the facts purportedly established, that John "engaged in physical abuse" as defined by the Policy. These failures violated the Formal Complaint Process, tainting both the Panel's decision and the Dean's determination of sanctions.

151.    The Panel's failure to make credibility findings is particularly troubling given the inconsistencies in Jane's account as well as Jane's and her advisor's lack of candor during the investigative process and the Hearing. For example, medical records indicate that Jane told a MGH clinician that she was "being followed by the Brandeis Health Center for a possible torn ligament in her left knee," which was not true. When questioned by John's advisor at the Title IX Hearing, Jane finally

admitted that she had not suffered a torn ligament, but neither she nor her advisor explained their failures up until that time to correct Jane's prior misrepresentations about this very serious supposed "injury."

152.    Section IV.A. of the Grievance Process specifically provides that when a student is found responsible for a violation of the Policy:

> the matter will be referred to the Dean of Students Office who will assign the appropriate sanctions or remedies. The determination regarding sanctions will include a consideration of any other disciplinary history the Respondent may have with the University as outlined in the Rights & Responsibilities Handbook, Section 20.

A copy of the Handbook in effect at relevant times is attached as Exhibit J. That section of the Handbook, in turn, provides that when assigning a sanction:

> all facets of the situation, including but not limited to the seriousness of the offense, prior history of violations, impact of the offense on others, the student's class year, the student's academic program, and information regarding intent, may be considered. Because the purpose of University conduct processes and decisions is to uphold and promote community standards, a learning component is also part of the sanctioning process whenever appropriate.

153.    In this case, Brandeis imposed a grossly disproportionate sanction on John, without explanation, consideration of the above-listed factors, any "learning component," or opportunity for input from John or exploration of the overall circumstances. John had no prior disciplinary history, or any history of violence, and was a studious Dean's list student with a challenging dual major. Moreover, it is undisputed that John never intended to harm Jane. It is also undisputed that Jane initiated and prolonged the "play wrestling" by grabbing John's sweater, refusing to

give it back to him, and physically keeping it from him. These failures to consider John's situation violated the Formal Complaint Process, fatally tainting the Dean's determination of sanctions.

154.    Moreover, the sanction determination is indefensible because, in the absence of complete and coherent written findings by the Panel, the Dean of Students Office necessarily had to rely on the grossly inaccurate, prejudicial, and substantially unproven "summary of allegations" contained in the Notice of Outcome and the tainted Final Report, substantial portions of which were refuted by information presented at the Hearing, but which the Panel's artificially truncated "findings" did not address.

155.    Finally, as the Court observed in *Doe v. Brandeis I*, "[c]onspicuously absent" from the list of bases for administrative appeal "is the ability to appeal on the ground that the [Panel's] decision was not supported by the evidence, or that it was otherwise unfair, unwise, or simply wrong. The [Panel], for all practical purposes, had the first and only say in determining [John's] guilt." 177 F. Supp. 3d at 607. Here, the Panel got it wrong, and John's inability to pursue an administrative appeal on that basis is fundamentally unfair.

156.    Viewed as a whole, the Process and Outcome lacked basic fairness and reflected gender bias against John by all involved, including the Director (Jurado), the Investigator (Imparato), the Hearing Panel, the University Appeal Board, and Brandeis itself.

**T.    Brandeis Faces Pressure to Vindicate Female Students, Validate Allegations of Dating Violence, and Punish Alleged Male Perpetrators Harshly.**

157.    For years, Brandeis has faced significant internal and external pressure "to stand up" for women, "to side with" women, and to punish harshly and without due process male students accused of sexual violence against female students.

158.    In or around 2014, the SpeakOut! Brandeis campaign, a "student-led initiative to promote awareness of the prevalence of sexual assault and harassment on our campus, and allow those affected by it to anonymously share their stories," began publishing anonymous testimonials about sexual violence online.[2] While the campaign website states that SpeakOut! Brandeis is "not a funded student club," it is currently featured in a list of "student groups" in the University's "Women's Gender, and Sexuality Guide to Brandeis."[3]

159.    In or around 2014, Brandeis Students Against Sexual Violence created an online petition asserting that "sexual violence exists on our campus and we need to respond." The petition urged the University to do more to address sexual violence and to "become a forerunner in the fight to end sexual violence on college campuses across the country."[4]

160.    In 2014, the University, along with dozens of others, including at least

---

[2] https://speakoutbrandeis.tumblr.com/

[3] https://www.brandeis.edu/wgs-guide/student-groups.html

[4] https://www.change.org/p/stronger-sexual-assault-response-prevention-and-awareness-at-brandeis-university

seven others in Massachusetts, was the subject of a Title IX investigation by the U.S. Department of Education.[5] The investigation put additional pressure on Brandeis to be perceived as protecting female students even at the expense of accused male students, and the effects of that pressure remain today.

161.    Also in 2014, a White House Task Force was established "to help schools live up to their obligations to protect students from sexual violence."[6] The Task Force pressed universities to provide "trauma-informed" training to their officials, stating that "when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable."[7]

162.    The "Start by Believing" campaign[8] is a prime example of so-called "trauma-informed" principles.  An organization called End Violence Against Women International has created training materials, with funding from the Department of

---

[5]https://www.bostonglobe.com/metro/2014/09/04/brandeis-university-latest-local-college-face-probe-for-handling-sexual-assault/tf3LNnZZaVqQwpTuGTtIkM/story.html

[6] https://www.justice.gov/archives/ovw/page/file/905942/download

[7] *Id.*

[8]    *See    generally*    https://startbybelieving.org;    *see    also* https://www.startbybelieving.org/wp-content/uploads/2020/08/Campaign-Action-Kit.pdf ("Campus Action Kit" advocating that students and administrators make "a personal commitment to Start by Believing," including a "pledge" to "Start by Believing when someone tells me about their sexual assault"; to "help survivors on the road to justice and healing"; and to "end the cycle of violence.").

Justice.[9] Investigators are trained to investigate cases with an initial presumption of guilt and to write reports that "successfully support the prosecution of sexual assault cases."[10] Among other things, investigators are trained to "recreate the entire reality of the sexual assault from the perspective of the victim"; to focus on evidence and statements that "corroborate the victim's account"; to "highlight implausible, absurd, and/or changing explanations provided by the suspect"; to "replace neutral words" with "more descriptive words"; and to "try to anticipate potential defense strategies and include the evidence and information necessary to counter those strategies."[11]

163.    On information and belief, Brandeis Community Advisors, including MS, and Brandeis investigators, including Imparato, were and are provided with "trauma-informed" training and are expected to conduct their activities in a manner substantially consistent with "Start by Believing" campaign principles. As a result, Brandeis Community Advisors, including MS, and Brandeis investigators, including Imparato, presume that a female complainant's account of an incident must be true and that her subjective impressions determine whether an accused male respondent's conduct amounts to "dating violence," sexual harassment, or assault.

164.    Brandeis continues to face pressure to vindicate female complainants,

---

[9] *See* https://evawintl.org/wp-content/uploads/Module-1_Report-Writing-11-9-2020-1.pdf

[10] *Id.*

[11] *Id.*

as demonstrated in newspaper articles, rallies, and other events focused on elevating the voices of victims of sexual violence and "tak[ing] back the night."

    a. On November 17, 2017, nearby Berklee College faced an uproar when the Boston Globe published an expose titled "Berklee let teachers quietly leave after alleged sex abuse, and pushed students for silence."[12] Outraged Berklee students created a petition called "Don't Let Berklee College of Music Keep Sexual Assault a Secret" that gained nearly 5,000 signatures. The Brandeis student newspaper, *The Justice*, reported on these events.[13]

    b. On January 24, 2019, in response to the Department of Education's proposed changes to Title IX regulations that increased due process protections to accused students, the University President delivered comments to the Brandeis community, reiterating that Brandeis was "firmly committed to ensuring that all members of our community can study and work in an environment free from sexual harassment and discrimination."[14]

---

[12] https://www.bostonglobe.com/metro/2017/11/08/berklee-college-lets-teachers-quietly-leave-after-alleged-sexual-abuse-students-least-one-found-another-teaching-job/yfCkCCmdJzxkiEgrQK4cWM/story.html?event=event12

[13] https://www.thejustice.org/article/2018/11/berklee-professors-united-after-globes-revelations-brandeis-university-feminist-faculty-alliance

[14] https://www.brandeis.edu/president/letters/2019-01-24-proposed-title-ix-regulations.html

c. In March 2019, Brandeis students were asked to participate in a Campus Climate Survey, incentivized with a $5 gift card, exploring students' "attitudes, experiences and opinions of sexual misconduct on our campuses."[15]  In a November 2019 letter addressing the findings of the survey, the University President stated:

> What the survey shows about sexual harassment and misconduct is disturbing and deeply troubling. The results remind us that preventing sexual assault and supporting survivors requires the focused work of all of us, not just those of us who are designated by job title to grapple with these issues. Importantly, they show how those in our community who belong to groups who have historically experienced more violence in our society are more likely to experience sexual violence, and are less likely to report it. The survey findings also demonstrate that despite our historical commitment to social justice and inclusion, harassment based on race and gender occurs within our community more frequently than it should.[16]

d. On October 19, 2021, *The Justice*'s Editorial Board published an editorial "acknowledging domestic violence awareness month," by "discussing recent abuse and sexual violence incidents on other college campuses." The Board noted that "people who have experienced domestic violence are more than just a number: you and your stories go

---

[15] https://www.brandeis.edu/provost/pdf/campus-climate-report-2019.pdf

[16] https://www.brandeis.edu/president/letters/2019-11-14-campus-climate-report.html

beyond any statistic."[17]

    e.  On November 16, 2021, a student accused Brandeis of being "complicit in upholding" the "structural roots to sexual violence" and "diluting the severity of sexual violence" by "discourage[ing] and actively prevent[ing] students from reporting."[18]

    f.  An art installation at Brandeis, called the "REDress Project" exhibits "red dresses hang[ing] from the trees on campus. Empty, they move with the wind like flags that draw attention to missing and murdered indigenous women and children who have been lost to violence." The project serves to "raise awareness of violence against Indigenous women and allow for a 'reclaiming of presence and power.'"[19]

    g.  On April 7, 2022, students held a "Take Back the Night" rally and vigil, described as "an annual stand against sexual violence."[20]

165.  Since cases alleging dating violence and sexual assault on college campuses overwhelmingly arise from women accusing men, measures put in place by

---

[17] https://www.thejustice.org/article/2021/10/editorial-acknowledging-domestic-violence-awareness-month

[18] https://www.thejustice.org/article/2021/11/beyond-liberty-university-how-brandeis-students-can-further-anti-violence-initiatives

[19] https://www.thejustice.org/article/2021/11/university-exhibits-redress-project-brandeis

[20] https://www.thejustice.org/article/2022/04/a-march-for-safety-intersectionality-and-empowerment

Brandeis to increase protection of victims and punishment of perpetrators foreseeably and necessarily result in disparate treatment of men.

166.    While the website of the Brandeis Office of Equal Opportunity[21] contains a section entitled, "Data," no actual content is available:



167.    On information and belief, analysis of Brandeis Title IX data would reveal disparate treatment of male students accused of misconduct against female students, including that male students are disproportionately found responsible for violating Brandeis policies and subjected to more severe sanctions.

## CAUSES OF ACTION

## COUNT ONE:  GENDER DISCRIMINATION UNDER TITLE IX
### (against Brandeis)

168.    John repeats and realleges the allegations above as if fully set forth

---

[21] *See* https://www.brandeis.edu/equal-opportunity/news-surveys/data.html (visited January 27, 2023).

here.

169.    Title IX prohibits Brandeis from discriminating against John on the basis of sex, including by subjecting John to a disciplinary process and/or outcome where sex is a motivating factor in the decision.

170.    Title IX further prohibits Brandeis from conducting a disciplinary proceeding that is not prompt, fair, and equitable.

171.    Brandeis employees and agents conducted a biased investigation, made incorrect determinations of fact, and ignored substantial evidence that supported John and undermined Jane's evolving claims that John had committed "dating violence."

172.    Brandeis employees and agents selectively enforced Brandeis policies to find John, a male student, responsible for policy violations. If the gender roles were reversed, Brandeis would not have found a comparable female student responsible for "dating violence" in a situation where an older male student invited a younger female student over, picked her up and brought her to his room, took her sweater and kept it away using physical force when she tried to leave, engaged in "play wrestling," and then later claimed *he* was injured during the incident. Brandeis would not have expected a younger female student to intuit that during "play wrestling," which the older male student initiated, the older male student was silently experiencing a "freeze response" and wanted to stop, despite continuing to hold onto the sweater. Brandeis would not have found the female student responsible for "dating violence" or suspended her.

173.   Although Jane initiated the incident by taking John's sweater, in an attempt to prevent him from leaving her room, without his consent and against his express wishes, Brandeis did not open an investigation or issue an Administrative Complaint against Jane. Nor did Brandeis take any action against Jane when it became clear she made false statements about the nature and extent of her alleged "injuries" and later failed to correct them. Brandeis did not ask if John was injured during the tussle, or if he wished to file his own complaint against Jane.

174.   Brandeis violated Title IX by depriving John of his right to be free from discrimination on the basis of sex and engaged in selective enforcement by subjecting John to an unfair disciplinary proceeding and unreasonably harsh sanction driven by gender bias and an intent to vindicate female student complaints, regardless of the underlying facts.

175.   Brandeis reached an erroneous outcome as a result of its biased and unfair investigation.

**COUNT TWO:  DISABILITY DISCRIMINATION**
**UNDER SECTION 504 OF THE REHABILITATION ACT OF 1973 AND/OR**
**THE AMERICANS WITH DISABILITIES ACT**
**(against Brandeis)**

176.   John repeats and realleges the allegations above as if fully set forth here.

177.   Section 504 of the Rehabilitation Act and implementing regulations prohibit Brandeis from excluding students from participation in its programs and services on the basis of disability. Brandeis is also prohibited from providing different and inferior access to or participation in services and programs on the basis of

57

disability.  Before imposing disciplinary consequences, Section 504 requires colleges to conduct a "manifestation determination," to determine whether student misconduct was a "manifestation" of a disability.

178.   Similarly, Title III of the ADA prohibits Brandeis from discriminating on the basis of disability and requires that it make reasonable accommodations necessary to provide a disabled individual with full and equal enjoyment of services, facilities, and privileges accorded to students.

179.   John suffers from severe ADHD and social anxiety. He has a "disability" under Section 504 and the ADA.

180.   Brandeis knew or should have known of John's disability.

181.   John was otherwise qualified to participate fully in his Brandeis education.

182.   Brandeis discriminated against John, on the basis of disability, by disciplining him for failing to *intuit* feelings that Jane was having during her purported "freeze response." Rather than reading Jane's taking of the sweater to mean she "wanted to be held," as she later told him, John reasonably interpreted her initiation of "play wrestling" over his sweater as an effort to prevent him from leaving an invitation to "play wrestle." Due to his ADHD and social anxiety, he was particularly ill-equipped to read non-verbal social cues. Brandeis never attempted to understand or accommodate John's subjective experience of the incident, as it did for Jane.

183.   When assessing "credibility," Brandeis applied a different standard to

assess John's and Jane's credibility, respectively. Brandeis went to great lengths to accommodate Jane's purported "trauma background," overlooking the inconsistencies in her account, accepting assertions about how she *felt* ("[I] went silent" or had a "freeze response") as tantamount to information that was outwardly communicated, and bending over backward to credit and validate her. Similarly, her self-report of physical symptoms was accepted as actual proof of a "concussion" and "torn knee ligament," neither of which was found by any medical professional. Yet Brandeis provided an entirely different service to John, one that not only failed to accommodate his disability but actively punished him for it.

184.   Brandeis failed to conduct an "manifestation determination" before determining the appropriate sanction against John, if any, and instead disciplined John for conduct that was a manifestation of or connected to a disability.

185.   John suffered damages as a direct and proximate result of Brandeis' violation of Section 504 of the Rehabilitation Action of 1973 and/or the ADA.

## COUNT THREE: BREACH OF CONTRACT
### (against Brandeis)

186.   John repeats and realleges the allegations above as if fully set forth here.

187.   John paid Brandeis money for his education, and in return, Brandeis contracted to provide John with access to its undergraduate degree program.

188.   The relationship between Brandeis and John is contractual in nature, and Brandeis owes John certain duties under that contract, based both in Brandeis' written policies and the John's reasonable expectations.

189.   Brandeis breached its contract with John by conducting an investigation and taking disciplinary action against John in violation of its policies and procedures, which provide for, among other things, a "prompt, equitable, fair, thorough, and impartial" investigation.

190.   Brandeis also breached its contract with John by conducting an investigation and taking disciplinary action against John that was arbitrary, capricious, and did not comport with basic fairness.

191.   As a direct and proximate result of Brandeis' breach, John suffered damages.

## COUNT FOUR:  BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (against Brandeis)

192.    John repeats and realleges the allegations above as if fully set forth herein.

193.    Every contract contains within it an implied covenant of good faith and fair dealing.

194.   Brandeis breached that implied covenant by pursuing the investigation and adjudication in an unfair and biased manner, and in order to serve the "political" aim of being perceived as sufficiently responsive to "dating violence" against women.

195.   As a direct and proximate result of Brandeis' breach, John suffered damages.

## COUNT FIVE:  NEGLIGENCE
### (against Brandeis, Imparato, and Jurado)

196.   John repeats and realleges the allegations above as if fully set forth

herein.

197.  Brandeis and its employees—including  MS, who is not named as an individual defendant, and Imparato and Jurado, who are named as individual defendants—owed duties of care to John as a student. Such duties included, without limitation, a duty of reasonable care in conducting Title IX and education disciplinary investigations and processes and a duty to provide diligent, fair, impartial, and reasonable treatment to students.

198.  Brandeis, MS, Imparato, and Jurado breached their duties of care by engaging in a biased, and unfair investigation, decision, and sanctions process.

199.  Brandeis also breached its duty of case by failing to properly train and supervise its employees and agents, including MS, Imparato, and Jurado.

200.  John suffered damages as a direct and proximate result of the negligence by Brandies, MS, Imparato, and Jurado.

## COUNT SIX:  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (against Brandeis, Imparato, and Jurado)

201.  John repeats and realleges the allegations above as if fully set forth herein.

202.  When Brandeis undertakes to investigate allegations of sexual and other misconduct against one of its students, the University and its employees and agents—here, specifically, MS, Imparato, and Jurado—owe that student duties to protect him from foreseeable harm and to act with reasonable care and fairness.

203.  John reasonably relied on each of their respective duties to protect him from foreseeable harm and to act with reasonable care and fairness.

204. For all of the above reasons, Brandeis, MS, Imparato, and Jurado each breached their duties of reasonable care and fairness.

205. As a result, John has suffered physical harm, including severe emotional distress. He experienced depression, anxiety, fear, inability to concentrate, sleep problems, lack of appetite, a deep sense of betrayal, and an aversion to the place that he hoped to make his academic home.

206. A reasonable person would have suffered severe emotional distress under the same or similar circumstances.

207. John has suffered damages as a direct and proximate result of the negligent infliction of emotional distress by Brandeis, MS, Imparato, and Jurado.

## COUNT SEVEN: DECLARATORY JUDGMENT AND INJUNCTION
### (against Brandeis)

208. John repeats and realleges the allegations above as if fully set forth herein.

209. Brandeis has violated its contractual obligations as well as Federal and State law.

210. John's educational and career opportunities have been severely diminished. Without appropriate redress, Brandeis' actions will continue to negatively and irreparably damage John.

211. Pursuant to 28 U.S.C. § 2201, John requests a judicial declaration that Brandeis violated his statutory rights (under Title IX, the Rehabilitation Act, and the Americans with Disabilities Act) and breached its contractual obligations, and that John is entitled to redress that will make him whole.

212.    John further requests that this Court issue a permanent injunction: (a) reversing the findings and sanction against John made by Brandeis pursuant to its investigation and disciplinary process; (b) ordering Brandeis to expunge John's disciplinary record and remove this from his education record at Brandeis; (c) ordering Brandeis to provide John with a Dean's Certification that shall be made available to third parties (such as law school admissions officers, bar admissions officers, and prospective and current employers) certifying that the disciplinary findings and sanction have been reversed and expunged from John's education record; and (d) ordering Brandeis to readmit John as a student in good standing, effective immediately.

## PRAYER FOR RELIEF

WHEREFORE, John respectfully requests the Court enter judgment against Brandeis, Imparato, and Jurado on each count against each of them. John further requests the Court:

1.    Order Brandeis to reverse its finding that John violated its policies, vacate its sanctions, and expunge his record;

2.    Order Brandeis to reinstate John as a student in good standing;

3.    Award John damages jointly and severally against each defendant in an amount to be determined at trial;

4.    Award John reasonable attorneys' fees and costs;

5.    Grant such further relief as this Court deems just, equitable, and proper.

Respectfully submitted,

**JOHN DOE**

by his attorneys,

/s/ William Fick

William W. Fick, BBO # 650562
Daniel Marx, BBO # 674583
Amy Barsky, BBO # 601111
**FICK & MARX LLP**
24 Federal Street, 4th Floor
Boston, MA  02210
857-321-8360
WFICK@FICKMARX.COM
DMARX@FICKMARX.COM
ABARSKY@FICKMARX.COM

January 27, 2023