UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE<br><br>         Plaintiff,<br><br>v.<br><br>BRANDEIS UNIVERSITY, ANNE-VALERIE IMPARATO, and SONIA JURADO<br><br>         Defendants. | C.A. No. 1:23-cv-10199-IT |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Pursuant to Federal Rule of Civil Procedure 12(b)(6) of the Federal Rules of Civil Procedure and Local Rule 7.1(b), Defendants Brandeis University ("Brandeis" or the "University"), Anne-Valerie Imparato ("Imparato"), and Sonia Jurado ("Jurado") (collectively, "Defendants") submit this memorandum of law in support of their Motion to Dismiss Count V (Negligence) and Count VI (Negligent Infliction of Emotional Distress) of Plaintiff John Doe's ("John" or "Plaintiff") Complaint.

**I.      Introduction**

After receiving the report of a Community Advisor that her suitemate had been physically assaulted by John, Brandeis responded promptly and in compliance with its written policies by opening an investigation and assigning an attorney to investigate. Given the seriousness and potential campus safety implications of the allegations, Brandeis initiated a formal administrative complaint against John. Brandeis notified John of the complaint, informed him of his right to have an advisor guide him through the University's disciplinary process, provided him multiple opportunities to present evidence on his behalf and provide comments on

1

a draft of the investigative report, and afforded him a hearing before a panel of one outside contractor and two Brandeis employees, at which John's retained attorney-advisor questioned witnesses and challenged the evidence against John.

Ultimately, John was found responsible for physical abuse constituting dating violence in contravention of Brandeis's written policies. By way of sanction, John was suspended from Brandeis for one year—permitted to return after December 31, 2022—and banned from holding any office or leadership role at Brandeis, or representing Brandeis in any capacity, upon his return. John exercised his right to file a written appeal to the University's appeal board. His appeal was considered and ultimately denied on May 22, 2022.

Eight months later, after he had already returned to Brandeis, John filed this lawsuit. As relevant to this Motion, John asserts claims for negligence and negligent infliction of emotional distress against Brandeis, Anne-Valerie Imparato (who investigated the allegations against John), and Sonia Jurado (who served as Title IX Coordinator) in connection with John's student disciplinary proceedings.[1] Under well-established law, courts have fittingly dismissed similar negligence-based counts arising from student disciplinary proceedings, as there is no independent, tort-based duty between students and schools beyond the contractual duty created by the underlying written policies. In the absence of such a duty, a negligence-based claim cannot be stated.

---

[1] While John advances a litany of other claims against Brandeis, the only claims asserted against Imparato and Jurado are the negligence-based claims.

2

## II.     Factual and Procedural Background[2]

### A.    The Incident

On February 8, 2021, MS, a Community Advisor at the University, reported to the University's Office of Equal Opportunity ("OEO") that John, a student at the University, had physically assaulted MS's suitemate, Jane Coe ("Jane"), also a student at the University, in the early morning hours of February 3, 2021 (the "Incident"). Complaint ("Cp."), ¶¶ 33, 35. Jurado, the University's Director of OEO and Title IX Coordinator, opened an investigation and assigned Imparato, an attorney and OEO investigator, to investigate the Incident. Cp., ¶¶ 8, 36, 38.

On February 17, 2021, Imparato interviewed Jane about the Incident. Cp., ¶ 42. Jane reported that she and John engaged in a physical struggle in her room over John's sweater. Cp., ¶¶ 42–43. Among other things, Jane reported to Imparato that John yelled at her, put his knee on her chest and arm as Jane was lying on the floor, choked her, and "smacked [Jane] around the place." Cp., ¶ 43. Jane further told Imparato, "I had a concussion from August to the end of January, and now I have another one." *Id*. Imparato responded that she was "so sorry," asked Jane if she felt that she was getting the help that she needed, and Imparato offered to talk to Jane's professors about an extension on a writing assignment. Cp., ¶¶ 44–45. Imparato asked Jane if she was interested in holding John accountable, and Jane responded, "I don't really want to go through whole case against him." Cp., ¶¶ 49–50.

After the February 17, 2021 meeting, Jane provided Imparato: (1) certain text messages between Jane and John; (2) medical records from Brandeis Health Center, which Jane visited on February 5, February 15, and February 19, 2021 (the "Brandeis Records"), and from

---

[2]  The factual allegations set forth in the Complaint are taken as true for purposes of this Motion to Dismiss only. Defendants accordingly reserve the right to deny all allegations in the Complaint upon resolution of their Motion to Dismiss.

Massachusetts General Hospital ("MGH"), where Jane received treatment for a concussion from March 25 to April 22, 2021 (the "MGH Records"); and (3) five photographs. Cp., ¶ 62; Affidavit of John D. Arnold ("Arnold Aff."), Ex. A (Imparato's Final Investigative Report).

Text messages submitted by Jane to Imparato include communications between Jane and John on the afternoon of February 4, 2021, several hours after the Incident. In her messages, Jane told John, "My knee hurts and I can't really bend it since the other night," and she emphasized that her knee was "probably have to go to the health center bad," to which John replied, "Idk [I don't know] what you want me to say, you could have let go of the sweater at any time or told me that I was seriously hurting you." Cp., ¶ 24. Later on February 4, Jane added that she was "kind of hurt," adding, "Particularly concerned about my head so I'm going to the health center tomorrow morning to make sure I'm still ok." *Id.*

The Brandeis Records provided to Imparato confirm that Jane went to the Brandeis Health Center on February 5, 2021. Among other things, the February 5 Brandeis Records reflect that Jane reported that John had "choked" her during an encounter on January 30, 2021, which "caus[ed] bruising on [Jane's] neck," and that she suffered an "assault" in her room during the Incident when John "became angry" and "hit her head against the wall, knelt on her left arm, [and] stood one leg on her abdomen." Arnold Aff., Ex. A, p. 18. The February 5 Brandeis Records reflect that Jane had completed a course of therapy for a previous concussion on January 26, 2021, and that she had been experiencing concussion symptoms in the two days since the Incident. *Id.*; Cp., ¶ 67. The February 5 Brandeis Records further reflect that Jane reported that she felt "not great," "tired," and "lost," and that "at times she needs to blink to focus." Arnold Aff., Ex. A, p. 18. The February 5 Brandeis Records also include observations that Jane had "tenderness r[ight] side of forehead," bilateral bruising on her neck "in [the] shape of fingers,"

4

and "bruising near [her] spinal column." *Id.* The February 19, 2021 Brandeis Records include the following assessment: "Concussion without loss of consciousness." *Id.* at p. 24.

The MGH Records provided to Imparato also reference Jane's account of the Incident and its reported impact. The MGH Records reflect that Jane reported that she was "assaulted" by a fellow student, and that her head "hit many things, including the floor, the wall, the dresser, and her bed" during the Incident. Arnold Aff., Ex. A, p. 27. The MGH Records note that Jane "sustained multiple scratches and bruises and is being followed by the Brandeis Health Center for a possible torn ligament in her left knee." *Id.* The MGH Records reference that Jane "sustained a new concussion," that she exhibited multiple "performance deficits," and that she "presents . . . with concussion symptoms including headaches, sensitivity to light, sensitivity, decreased screen tolerance, and extreme fatigue." *Id.* at pp. 27–28.

Of the five photographs submitted by Jane to Imparato, two depict red marks and/or bruising on Jane's neck; one of these photographs contains a date stamp of January 31, 2021, which is the day after Jane reported that John had choked her during an encounter on January 30, 2021, three days before the Incident (per the Brandeis Records). Cp, ¶ 63; Arnold Aff., Ex. A, p. 18.

### B. The University's Administrative Complaint

Pursuant to the University's Policy Against Discrimination, Harassment & Sexual Violence (the "Policy"), the University may initiate an Administrative Formal Complaint against a student "where the person(s) who experienced the alleged conduct is unable or uninterested in initiating the process and/or the conduct at issue poses a threat to campus safety (which includes, but is not limited to, the involvement of physical violence, the use of weapons, an ongoing threat, or the involvement of minors or repeat offenders/multiple victims)." Cp., Ex. B, p. 5.

On March 10, 2021, Jurado and Imparato spoke with Jane for about fifteen minutes about the prospect of the University initiating an Administrative Formal Complaint against John pursuant to the Policy. Cp., ¶¶ 51–52. Jurado stated that University was "concerned" about John "being a safety risk," which she said presented a circumstance that the University "[had] to address." Cp., ¶ 54. Jurado further stated that the University "need[ed] to start" the Administrative Complaint process because the matter was "too serious for us not" to do so. Cp., ¶ 56. Jurado then told Jane, "You shared this information, and it's our job for us to do the process…. the heavy lifting is stuff we'll do because that's our job." Cp., ¶ 58.

On March 26, 2021, Jurado provide John a Notice of Complaint informing him that the University was pursuing an Administrative Formal Complaint (the 'Notice"). Cp., ¶ 69. The Notice stated:

> A report has been received by Brandeis University which alleges that you may have violated the University's Policy Against Discrimination, Harassment & Sexual Violence. It has been alleged that on or about February 3, 2021, you were play wrestling with a female student who you had recently started dating, which then turned violent. It is alleged that during this incident you choked the student, pinned her arm behind her head, stepped on her stomach and knee, and threw her into furniture, resulting in injuries to that student.

Cp., ¶ 70, Ex. C. Jurado apprised John that he was presumed "not responsible" for the alleged conduct. *Id.* Among other things, Jurado also stated that she had assigned Imparato to conduct the investigation, that John would have the opportunity to "speak in detail regarding these allegations and to provide [his] viewpoint," that he had "the right to have a support person/advisor present at every meeting within this process," that he would have an opportunity to inspect, review, and respond to all relevant information during the investigative process, and that he would have the opportunity to independently review and comment upon a draft Investigative Report, as well as the interviews and documentation gathered during the investigation. Cp., ¶ 71, Ex. C.

6

### C. John's Perspective on the Incident, and His Request for an Informal Resolution

Later on March 26, 2021, John sent an email to Jurado offering his perspective on the Incident. Cp., ¶ 72. John stated that as he was readying to leave Jane's room, Jane "grabbed" his sweater and "refused to give it up." *Id.* John acknowledged that a "struggle" then ensued during which he "attempted to wrest the sweater" from Jane's hands by "pin[ning] her arms and hold[ing] down her leg." *Id.* John denied choking Jane but stated that he did "not recall" stepping on Jane's stomach or "throwing her against furniture." *Id.* John further stated, "I accept that I inadvertently injured her, but I only realized this after she informed me later . . . . [Jane] could have let go of the sweater at any time and I would have stopped pinning her. This is not to blame her for any injury that I may have caused her, but to underscore that I was not at all interested in harming her or causing her pain in any way." *Id.*

On March 30, 2021, Imparato conducted her first interview with John. Cp., ¶ 73. During this interview, Imparato questioned John about the Incident (including Jane's allegations about what had occurred) and about the text messages and photographs that Jane had provided to Imparato. Cp., ¶¶ 78–80.[3]

---

[3] In the Complaint, John alleges that Imparato "falsely told" him during this interview (1) that Jane had reported that she was "crying" during the Incident and told John that he was "hurting her," (2) that Jane had reported that John had "slammed her" against the wall and floor, (3) that Jane reported that he had "choked" her, and (4) that Jane had reported that the photos of bruises on her neck that she submitted to Imparato reflected the impact of physical altercation, not "hickeys." Cp., ¶ 80. John alleges that Imparato "embellished and exaggerated" what she had heard from Jane. *Id.* In fact, Imparato's remarks were consistent with what Jane had reported, both to Imparato and to her health care providers. *See* Arnold Aff., Ex. A, p. 3 (Jane initially reported to Imparato that she was "crying" during the Incident and told John, "You're hurting me"); p. 3 (Jane reported that John "grabbed her from the floor and slammed her against her bed, her dresser, her wall, and her desk"); p. 6 (Brandeis Records reflect that Jane reported that John "hit her head against the wall"); p. 7 (MGH Records reflect that Jane reported that her "head hit many things including the floor, the wall, the dresser, and her bed"); p. 5 (Jane reported that John had "choked her" during a sexual encounter on January 30 and that she sent to a text to John stating, "I've come to the conclusion that I think there is literally a bruise from your hand on my neck," not "hickeys"); p. 6 (Jane reported to the Brandeis Medical Center that "on 1/30 [John] choked her, causing bruising on her neck"); , p. 5 (Jane reported that the Incident "exacerbated the marks on her neck, and that her neck was more bruised on February 3 than it had been on January 30"). It was entirely appropriate for Imparato to share this information with John and ask about his perspective and response.

Several days after his initial interview, John sent an email to Imparato stating that he would "welcome the opportunity" to participate in an informal resolution process with Jane. Cp., ¶ 81. On April 23, 2021, Jurado, as the OEO Director, informed John that the University, which had initiated the Administrative Complaint, was "not interested in pursuing an informal resolution" and that the investigation "will continue to move forward." Cp., ¶ 84.[4]

### D.  The Continued Investigation and Preparation of the Investigative Report

Through April and into early June 2021, Imparato continued her investigation, and she conducted an interview with MS, another interview with John, and another interview with Jane. Cp., ¶¶ 86, 94, 98.

The University's Policy provides that upon the completion of an investigation, the investigator will prepare a draft investigative report for review by the parties. Specifically, the Policy provides:

> The Complainant/Respondent will be given access to the draft Investigative Report and gathered information for ten (10) business days. The Complainant and Respondent will have the option (but are not required) to provide written comments regarding the draft Investigative Report and the gathered information within that ten (10) business days period. Those comments should contain a party's substantive comments on the content of the draft Investigative Report and gathered materials.
>
> All submitted comments should be written by the parties (submissions by third parties, such as friends, family, advisors or attorneys may not be considered). Only comments to the draft Investigative Report that are submitted in writing to the Investigator within the ten (10) business day period will be considered in the Formal Complaint Process.
>
> After receipt of the comments from the parties (if any), the Investigator will address those comments as they deem appropriate, at their discretion.

Cp., Ex. B, pp. 12–13.

---

[4] Under the Policy, this decision was in Jurado's discretion as the Director of OEO. The Policy provides, in pertinent part, "The Director of the Office of Equal Opportunity (or their designee) (Director) will decide whether to start, delay, continue or stop the Investigative Procedure during the Informal Resolution Process, at their discretion . . . . The Director will make the determination regarding whether the Informal Resolution Process will be an option in a pending matter based on a review and assessment of the allegations, the available information, and the interests of the parties." Cp., Ex. B, p. 7

8

On August 30, 2021, Imparato prepared a draft investigative report, which was made available to John and his advisor through an online portal, along with interview summaries, redacted medical records, photos, and text messages. Cp., ¶ 107. John submitted his response to the draft investigative report on September 17, 2021, in which he objected to and provided comments on the report's description of Jane's "purported injuries," photographs of Jane's "neck bruising," the "credibility assessment" in the report, and Imparato's description of the "Issues to be Decided" by the Hearing Panel. Cp., ¶¶ 107–116. John's comments on the report were provided to the Hearing Panel. *See* Cp., Ex. G, p. 3 (noting that John's comments on the investigative report were provided to the Hearing Panel).

On October 15, 2021, Imparato issued her Final Investigative Report. Cp., ¶ 117.

E.     **The Hearing**

On November 8, 2021, Brandeis conducted a Title IX Grievance Process Hearing with a Decision-Making Panel comprised of an outside contractor acting as chairperson and two Brandeis employees. Cp., ¶¶ 120–121. Both John and Jane were represented by advisors at the hearing. Cp., ¶¶ 122–123. The Policy provides that, "The Hearing is meant to be a forum for presenting relevant, factual information to the Decision-Making Panel that will be helpful in making a finding of whether the Respondent is Responsible or Not Responsible for violating the Policy." Cp., Ex. B, p. 11 (emphasis added). "The parties each have the right to question, through their support person/advisor, the Investigator, the other party(s), and any witnesses who appear at the Hearing. A party has the option to submit questions in advance at the Pre-Hearing Conference for a finding of relevance by the Chair." *Id.* John does not allege that his advisor submitted any questions to the Chair for relevancy determinations in advance. *See generally,* Cp. For questions not submitted in advance, the Policy provides that, "The support person/advisor will then present the question to the Chair who will make a finding as to whether

9

the proposed question is relevant to the Formal Complaint. Questions that are repetitive of information already presented to the Panel or that are abusive or badgering of a party or witness will be deemed irrelevant." Cp., Ex. B, p. 11. The chairperson—a third-party contractor—did not permit John's advisor to ask Imparato "*why*" Imparato took certain actions but did permit him to ask questions pertaining to factual information. *See* Cp., ¶ 124 (emphasis original). As provided by the Policy, the chairperson noted the rationale for excluding questions on the grounds of non-relevance. Cp., Ex. B, p. 11; Ex. G ("The [University Appeal Board] finds no procedural error because when the Hearing Chair determined that a question posed was not relevant, she provided the rationale for the determination on the recording as required by the Title IX Grievance Process.")

      F.    **<u>The Notice of Outcome</u>**

On December 16, 2021, Brandeis issued a Notice of Outcome. Cp., ¶ 126. The Notice of Outcome recites Jane's allegations, provides a brief procedural summary, and states the Decision-Making Panel's findings on the four "Issues to be Decided" and their reasoning. Cp., Ex. E. The Decision-Making Panel found that it was "undisputed that [John] stated he pinned [Jane] to the ground and was wrestling with her on February 3, 2021," and that it was "more likely than not that [John] slammed or pushed [Jane] into various items of furniture on February 3, 2021." *Id*. The Decision-Making Panel found there to be "insufficient information to determine that [John] wrapped his sweater around [Jane's] neck and choked her with it," or that "[John] put his knee into [Jane's] arm and chest on February 3, 2021." *Id*. Based on those findings, the Dean of Students Office suspended John for one year and banned him from holding any office or leadership role at Brandeis, or representing Brandeis in any capacity, upon his return. Cp., ¶ 131.

### G. The Appeal

The Policy provides there are only "three grounds on which an appeal [to the Notice of Outcome] can be filed—procedural error, the availability of new information, and bias." Cp., Ex. H, p. 13.  On January 6, 2022, John filed an administrative appeal.  Cp., ¶ 132.  On May 19, 2022, the Brandeis University Appeal Board ("UAB") issued a Notice of Outcome of Appeal. Cp., ¶ 133.  Therein, the UAB states that it had "met to review the remaining portions of the submitted appeal [that it had not already rejected as improper bases for appeal], as well as the Investigative Report, the Hearing Transcript, and the Notice of Outcome letter."  Cp., Ex. G. The UAB addresses the ten remaining portions of the appeal in individual paragraphs.  *Id*.  In each instance, the UAB found there had been either no procedural error or no evidence of bias, as applicable, and explained their reasoning.  *Id*.  The UAB dismissed the appeal.  *Id*.

## III. Argument

### A. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, not mere possibility, is the "touchstone by which the sufficiency of a complaint is gauged."  *Morales-Cruz v. Univ. of Puerto Rico*, 676 F.3d 220, 224 (1st Cir. 2012).  A complaint is insufficient if it offers "labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555.  "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal."  *Morales-Cruz*, 676 F.3d at 224 (quoting *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010)).  It is well-settled that when ruling on a motion to dismiss, courts set aside conclusory legal allegations and only consider "well-pled, (i.e., non-

11

conclusory, non-speculative) facts as true." *Harris v. Univ. of Massachusetts, Lowell*, 557 F. Supp. 3d 304, 307 (D. Mass. 2021) ("Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit.") (citation and quotation omitted).

Here, Counts V and VI of the Complaint fall far short of the well-established requirements to state a viable claim. For the reasons set forth below, each of these claims must be dismissed.

### B.    The Court Should Dismiss John's Claim for Negligence (Count V)

John's claim for negligence should be dismissed because the rights and obligations of students and universities in connection with student conduct proceedings are contractual in nature, thereby precluding claims sounding in tort. *See Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 338 (1st Cir. 2022) (affirming grant of motion to dismiss negligence-based claims pertaining to Title IX investigation in absence of duty of care independent of contractual duty); *Doe v. Trustees of Boston Coll.*, 892 F.3d 67, 94 (1st Cir. 2018) (same). In any negligence case, the plaintiff must prove (1) a legal duty owed by defendant to plaintiff; (2) a breach of that duty; (3) proximate or legal cause; and (4) actual damage or injury. *See*, *e.g.*, *Jorgensen v. Massachusetts Port Auth.*, 905 F.2d 515, 522 (1st Cir. 1990) (applying Massachusetts law). Under Massachusetts law, "[w]hether or not a duty of care existed is a question of law for the court." *Gorfinkle v. U.S. Airways, Inc.*, 431 F.3d 19, 23 (1st Cir. 2005) (citing *O'Sullivan v. Shaw*, 431 Mass. 201 (2000)).

The only factual allegations presented in support of John's negligence-based claims pertain to the University's Title IX investigation and processes. Specifically, John alleges that Defendants "breached their duties of care by engaging in a biased, and unfair investigation, decision, and sanctions process." Cp., ¶ 198. Where a student's claims arise from proceedings conducted pursuant to a university handbook—as here, from the Brandeis Policy Against

Discrimination, Harassment & Sexual Violence (Cp., Ex. B)—the university does not owe "'any additional independent duty [in tort] outside of their existing contractual relationship.'" *Stonehill Coll., Inc.*, 55 F.4th at 338 (quoting *Trustees of Boston Coll.*, 892 F.3d at 94–95); s*ee also Doe v. Harvard Univ.*, 462 F. Supp. 3d 51, 67–68 (D. Mass. 2020) ("'[A] remedy for a breach of this contractual obligation based on alleged failure to use due care in conducting the [student misconduct] process 'must sound in contract, not in tort.'").

Likewise, as to the individual defendants, the Massachusetts Supreme Judicial Court has held that, "[a]bsent a legal duty, there can be no personal liability." *Lyon v. Morphew*, 424 Mass. 828, 833 (1997). As Brandeis did not owe any independent duty to John outside of its existing contractual relationship, nor did Jurado and Imparato. *See Trustees of Boston Coll.*, 892 F.3d at 95 (dismissing negligence claims against college administrators involved in underlying student disciplinary proceedings in absence of duty sounding in tort where college did not owe independent duty to student outside of contractual relationship).

To the extent that John alleges that Brandeis also breached its "duty of case [sic] by failing to properly train and supervise its employees and agents," that theory is fundamentally and fatally flawed. Complaint, ¶ 199. John's negligent supervision claim fails for the same reason that his ordinary negligence claim fails—the existence of the contractual relationship between John and Brandeis precludes recovery in tort. *See Trustees of Boston Coll.*, 892 F.3d at 94. Even if his negligent supervision theory was not precluded by his contractual relationship with Brandeis, John's claim fails because he has not alleged sufficient facts to support that claim. To allege negligent supervision, "a plaintiff must show that the 'employer [became] aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fail[ed] to take further action such as investigating, discharge or reassignment.'"

*Helfman v. Northeastern Univ.*, 485 Mass. 308, 326 (2020) (quoting *Foster v. The Loft, Inc.*, 26 Mass. App. Ct. 289, 291(1988)).  John alleges only that Brandeis is liable for negligent supervision because Brandeis "fail[ed] to properly train and supervise its employees and agents, including MS, Imparato, and Jurado." Cp., ¶ 199.  There are no specific, nonconclusory allegations that MS, Imparato, and Jurado were untrained or otherwise unfit to perform their duties prior to the initiation of the investigation.  Nor does John allege how Brandeis would or should have become aware of the alleged unfitness of MS, Imparato, or Jurado[5] in advance of the subject investigation and resulting process as required to state a claim for negligent supervision.  *See Stonehill Coll., Inc.*, 55 F.4th at 338 (dismissing negligent supervision claim where plaintiff did not "allege with any specificity how [the Title IX Coordinator] would have become aware of th[e] alleged incompetence [of employees involved in Title IX process]").  Rather than allege that MS, Imparato, and Jurado were untrained or inadequately trained, John takes aim at the "trauma-informed" approach to sexual assault investigations promulgated by a White House Task Force in 2014.  Complaint, ¶ 161.  He alleges not that Brandeis inadequately trained its employees in the "trauma-informed" approach, but that this approach—the recommended approach of a task force established by the President of the United States to help protect students from sexual assault—is itself flawed.  *Id*.  That opinion, seemingly predicated entirely on the personal beliefs of John about how sexual assault investigations should be conducted, does not permit the conclusion that a university that utilizes the "trauma-informed" approach is therefore

---

[5]  While John advances several allegations "on information and belief" regarding supposed "habits and practices" of Jurado (Cp., ¶¶ 146–147), he does not allege any facts suggesting that Jurado's supervisor was aware, or should have been aware, of these habits and practices in advance of Jurado's involvement in initiating the investigation and related processes.  As John recognizes, Jurado had nearly a decade of experience in Title IX investigation and enforcement positions at other colleges and universities prior to joining Brandeis in 2019.  Cp. ¶ 9.

inadequately training its employees. Accordingly, John has failed to state a claim for negligence, and Count V of the Complaint should be dismissed as to all Defendants.

### C. The Court Should Dismiss John's Claim for Negligent Infliction of Emotional Distress (Count VI)

As negligence is a threshold element of any claim for negligent infliction of emotional distress,[6] John's inability to establish any non-contractual duty of care is fatal to that claim as well. *See Stonehill Coll., Inc.*, 55 F.4th at 338 (finding failure of negligence claim fatal to negligent infliction of emotional distress claim); *see also Trustees of Boston Coll.*, 892 F.3d at 95 ("Because we are unable to find an independent duty outside of the contractual relationship between the Does and B.C., the Does' claim [for negligent infliction of emotional distress] fails . . . ."). Accordingly, Count VI should be dismissed as to all Defendants.

### CONCLUSION

For the reasons set forth above, Defendants request that this Court Dismiss Count V and Count VI of the Complaint for failure to state a claim.

        **BRANDEIS UNIVERSITY, ANNE-VALERIE IMPARATO, AND SONIA JURADO**
        By their attorneys,

        /s/ _____
        Scott A. Roberts (BBO# 550732)
           *sroberts@hrwlawyers.com*
        John D. Arnold (BBO# 699350)
           *jarnold@hrwlawyers.com*
        Hirsch Roberts Weinstein LLP
        24 Federal Street, 12th Floor
        Boston, MA 02110
        Phone: (617) 348-4300

Dated: May 2, 2023

---

[6] To state a negligent infliction of emotional distress claim, John must allege "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." *Rodriguez v. Cambridge Hous. Auth.*, 443 Mass. 697, 701 (2005).

## CERTIFICATE OF SERVICE

I, Scott A. Roberts, certify that this document, filed through the Electronic Case Filing (ECF) system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 2, 2023.

/s/ Scott A. Roberts
Scott A. Roberts