UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff,<br><br>    v.<br><br>BRANDEIS UNIVERSITY,<br>ANNE-VALERIE IMPARATO,<br>and SONIA JURADO,<br><br>    Defendants. | Civil Action No. 1:23-cv-10199-IT |

MEMORANDUM & ORDER

February 22, 2024

TALWANI, D.J.

Plaintiff, proceeding here as John Doe, brings this case against Brandeis University ("Brandeis") and its employees Anne-Valerie Imparato and Sonia Jurado. Plaintiff alleges that throughout a student disciplinary proceeding for alleged "dating violence," Brandeis, Imparato, and Jurado breached their duty of care to him as a student and negligently inflicted emotional distress. Plaintiff also alleges gender and disability discrimination, breach of contract, and breach of the implied covenant of good faith and fair dealing. Before the court is Defendants' Motion to Dismiss [Doc. No. 20] Count V (Negligence) and Count VI (Negligent Infliction of Emotional Distress) of Plaintiff's Complaint [Doc. No. 1] and Plaintiff's request in his Opposition [Doc. No. 32] to amend his Complaint to include a defamation claim against Jurado and Imparato, and a negligent supervision and training claim against Brandeis and Jurado. For the reasons set forth herein, the Motion to Dismiss [Doc. No. 20] Counts V and VI of the Complaint is GRANTED and Plaintiff's request in his opposition for leave to amend his Complaint is DENIED.

I.    **Factual Background as Alleged in the Complaint**

At the end of January 2021, when Plaintiff was a sophomore at Brandeis, he met another Brandeis student, a senior referred to in the Complaint as Jane Coe, through an online dating app. Compl. ¶¶ 2, 14 [Doc. No. 1]. Their first in-person interaction was on January 30, three days prior to the incident at issue. Id. ¶ 14.

After their first meeting, Plaintiff and Coe communicated primarily via text messages, and exchanged numerous texts. Id. ¶¶ 15-18; see also id., Ex. A (Text Chain) [Doc. No. 1-1]. On February 2, Coe texted that she had fallen on the ice and was concerned about getting "another concussion" due to the ice and snow. Id. ¶ 18.

A.    *The Incident*

Later that evening (February 2), Coe picked up Plaintiff and they went back to Coe's room where they worked on homework and engaged in consensual intimate activity. Id. ¶ 19.

In the early hours of February 3, Plaintiff told Coe he needed to leave her room. Id. at ¶ 20. As Plaintiff went to put on his sweater, Coe grabbed it from him and refused to return it when asked. Id. The two began "play wrestling" (Coe's words) over the sweater. Id. Coe, who was roughly the same size as Plaintiff, "used her whole body to keep the sweater from him," and Plaintiff briefly held down her arms and legs while trying to get the sweater back. Id. During the brief tussle for the sweater, the pair ran into the furniture in Coe's room. Id. At no point during the encounter did Coe tell Plaintiff to stop or indicate that he was hurting her. Id. ¶ 21.

After a minute or two, Coe gave Plaintiff the sweater and drove him back to his room. Id. ¶¶ 20, 22. During the drive, Coe joked that Plaintiff had "abused" her, and he responded that he did not find the joke funny. Id. ¶ 22. At 2:20 a.m., Coe texted Plaintiff that she "kn[e]w [he] didn't actually abuse [her]," that she would not tell anyone he did, and that she "[s]hould have

clarified[.]" Id. Plaintiff responded later that morning not to worry and that he "knew [she] w[asn't] serious[.]" Id. Plaintiff and Coe exchanged further brief texts that evening (February 3) and the next afternoon. Id., Ex. A (Text Chain) 13 [Doc. No. 1-1].

On the evening of February 4 through just past midnight, Plaintiff and Coe had the following text exchange:

| | | |
|---|---|---|
| [Coe 5:23 p.m.]: | | How are you doing |
| [Plaintiff 6:56 p.m.]: | | Decent ig [I guess], hbu [how about you] |
| [Coe 6:59 p.m.]: | | My knee hurts and I can't really bend it since the other night so I'm dealing with that |
| [Plaintiff 7:21 p.m.]: | | Oof |
| [Plaintiff 7:21 p.m.]: | | Sorry |
| [Coe 7:27 p.m.]: | | I don't think you get it like its I probably have to go to the health center bad |
| [Plaintiff 7:49 p.m.]: | | Idk [I don't know] what you want me to say, you could have let go of the sweater at any time or told me that I was seriously hurting you |
| [Coe 9:56 p.m.]: | | You didn't mean it? |
| [Coe 10:18 p.m.]: | | I was a little scared |
| [Plaintiff 10:19 p.m.]: | | What are you asking me about not having meant? |
| [Coe 10:25 p.m.]: | | I'm a little drunk right now idk [I don't know] if I should have this conversation right now |
| [Coe 10:26 p.m.]: | | It's just because I have a trauma background so I am easily scared and go into a freeze response which is why I didn't say much when it was happening and I also just recovered from my concussion so I have to be extra careful |
| [Plaintiff 10:34 p.m.]: | | My sole motivation was to get my sweater back. I was annoyed at you for holding on to it and (in hindsight very immaturely) didn't want to "admit defeat" by giving up, but the idea of hurting you never crossed my mind. |
| [Coe 10:37 p.m.]: | | Ok, I think it was just a miscommunication. But I am kind of hurt |
| [Coe 10:38 p.m.]: | | Particularly concerned about my head so I'm going to the health center tomorrow morning to make sure I'm still ok |

3

[Plaintiff 10:42 p.m.]: I'm really sorry that I did anything to make you feel afraid or unsafe. If I had realized you felt that way I would have stopped trying to get my sweater back

[Coe 10:43 p.m.]: Thanks for apologizing

[Plaintiff 10:50 p.m.]: Is there a way that I could tell in the future if you or someone else is going into a freeze response rather than simply being recalcitrant?

[Coe 11:00 p.m.]: I think checking in a lot to make sure and being patient because sometimes it takes a while to verbalize it

[Coe 11:03 p.m.] Especially for people who have people pleasing tendencies and feel bad standing up for themselves

[Plaintiff 11:11 p.m.]: Alright noted

[Coe 11:15 p.m.]: I'm half awake after a "party"

[Coe 11:15 p.m.]: Of like two friends

[Plaintiff 11:16 p.m.]: Was it fun?

[Coe 11:17 p.m.]: It was but I'm sweaty

[Coe 11:20 p.m.]: Very tired

[Plaintiff 11:24 p.m.]: It's like 2 and a half hours past ur [your] bedtime do [so] that's understandable lol [laugh out loud]

[Coe 11:31 p.m.]: It really is

[Coe 11:31 p.m.]: I'm still not even home

[Coe 11:45 p.m.]: Lol [Laugh out loud]

[Coe 11:59 p.m.]: Finally leaving

[Coe 12:46 a.m., 2/5]: I am sometimes not good at verbalizing my needs but I think what I wanted when I took your sweater was to be held

Id. ¶ 24. The texts resumed with Plaintiff writing at 1:00 p.m. "That makes me feel really guilty, I'm sorry" and Coe responding at 5:15 p.m., "Thanks for apologizing." Id.

    B.    *Communications over the Next Few Days and Coe's Suitemate's Report of a Physical Assault*

Coe also exchanged messages about Plaintiff, Coe and Plaintiff's relationship, and the sweater incident with her suitemate, referred to in the Complaint as MS. Id. ¶¶ 27-28. MS was a "Community Advisor" at Brandeis with the role of "reporting violations of Brandeis' policies

4

and 'community standards.'" Id. ¶¶ 32-33. After Coe told MS about the incident and Plaintiff's apology, MS texted back on February 4 that she would "write him up." Id. ¶ 27.

On February 7, Coe told Plaintiff that she was not happy with their relationship and that he should not assume he would see her again. Id. ¶ 30.

On or around February 8, 2021, MS reported to the Brandeis Office of Equal Opportunity that Plaintiff had physically assaulted Coe on February 3. Id. ¶ 35.

On February 9, Plaintiff asked Coe if she wanted to get breakfast the following morning, and Coe did not respond. The pair exchanged no further texts. Id. ¶ 31.

  C. *The Investigation and Disciplinary Proceeding*

Following MS's report, Defendant Sonia Jurado, Director of the Brandeis Office of Equal Opportunity and Title IX and ADA/Section 504 Coordinator, opened an investigation into the incident. Id. ¶ 36. Brandeis assigned Defendant Anne-Valerie Imparato, an attorney-investigator and employee of Brandeis, to conduct the investigation, purportedly in accordance with its Formal Complaint Process. Id. ¶¶ 37-38; see Compl., Ex. B (Formal Complaint Process) [Doc. No. 1-2].

Imparato interviewed Coe, Plaintiff, and MS, recording each interview and summarizing them in a document that included some purportedly verbatim quotations. Compl. ¶ 41 [Doc. No. 1]. Plaintiff had temporary access to the summaries at various points in the investigation but was not permitted to listen to the recordings. Id.

Imparato interviewed Coe on February 17, March 10, and June 3, 2021. During those interviews, Imparato asked about the facts of the incident from Coe's perspective. Id. ¶¶ 42, 51, 98. Plaintiff alleges that during those interviews, Imparato did not ask Coe for a detailed chronology of the incident, ask any specific follow-up questions regarding Coe's account, or

attempt to clarify inconsistencies in Coe's account of the incident. Id. ¶ 44. Imparato also asked Coe about her contact with Plaintiff since the incident but did not ask to see the text messages between the two. Id. ¶¶ 46-47. When Imparato was later shown the text messages between the pair, she did not ask Coe any follow-up questions. Id.

Jurado participated in the second interview of Coe. Id. ¶ 60. During that interview, Jurado and Imparato explained to Coe the process if Brandeis decided to initiate an Administrative Complaint against Plaintiff and asked for Coe's cooperation. Id. ¶¶ 51-53. The administrators also expressed that they would take steps to care for and protect Coe during the disciplinary process if she needed support. Id. ¶ 53. Jurado explained that Brandeis was "concerned" about Plaintiff "being a safety risk" and that the issue was "too serious" for Brandeis not to address it. Id. ¶ 54, 56.

Plaintiff received notice of a complaint against him on March 26, 2021, after Coe had been interviewed twice and Jurado and Imparato had expressed their concern to Coe that Plaintiff was a safety risk that Brandeis should investigate. Id. ¶ 69; see Compl., Ex. C (Notice of Complaint) [Doc. No. 1-3]. The Notice of Complaint stated:

> It has been alleged that on or about February 3, 2021 you were play wrestling with a female student who you had recently started dating, which then turned violent. It is alleged that during this incident you choked the student, pinned her arm behind her head, stepped on her stomach and knee, and threw her into furniture, resulting in injuries to that student.

Id. ¶ 70.

Plaintiff responded to the Notice of Complaint via email to Imparato later that same day. Id. ¶ 72. In his response, Plaintiff denied pinning Coe's torso, choking her, or throwing her against furniture. Id. He noted that his only motivation during the encounter was to retrieve his sweater and wrote: "I also want to be very clear that nothing that I did during this event was motivated by a desire to inflict any sort of pain on [Coe]." Id.

6

In Imparato's two interviews of Plaintiff in April and May, Plaintiff contested several of Coe's allegations, as relayed by Imparato, and reiterated that Coe did not express during the incident that he was hurting her and that he did not strangle her, choke her, or slam her against the wall or furniture. Id. ¶ 72-73, 80, 94-96. During the second interview, Imparato showed Plaintiff photographs Coe had provided of her alleged injury, at least one of which was date-stamped January 31, 2021, three days prior to the February 3 incident. Id. ¶ 95. Plaintiff then asked if Brandeis would have an independent expert look at the photographs Coe had submitted of marks on her neck to determine if they were consistent with hickeys, rather than choking. Id. ¶ 96. Brandeis later told Plaintiff that he could retain such an expert at his own expense. Id. ¶ 97. During this period, Plaintiff also sent the complete collection of texts he and Coe had exchanged to Imparato because he believed it would be helpful to the investigation. Id. ¶ 81. Imparato did not follow-up with Plaintiff about the full texts and told Coe that Plaintiff had sent Imparato the full record of messages, but that they were "not relevant" except for the excerpts provided by Coe. Id. ¶¶ 83, 104.

Imparato also interviewed MS during this time, and her testimony contradicted some of Coe's statements. Id. ¶¶ 91-92. MS told Imparato that Coe told her that Plaintiff was, at one point, "standing on [Coe's] vocal cords," a claim that Coe herself never made to Imparato or Jurado. Id. ¶ 89.

On August 31, 2021, Imparato issued a Draft Investigative Report to which Plaintiff had temporary access. Id. ¶ 107. Among other issues, the Draft Report proposed a "finding" of "undisputed fact[s]" that were actually disputed, both by Plaintiff and because they were unsupported by the available evidence. Id. ¶ 109. Plaintiff responded to the Draft Report on September 17, 2021, arguing that the conclusions it drew were not supported by the record, that

the photographs of Coe's alleged injuries were either undated or dated three days prior to the incident, that the Report's "credibility assessment" was flawed, and that common sense suggested he could not be found guilty of physical abuse when any harm had been inadvertently caused. Id. ¶¶ 112-16. Plaintiff asked that he be given an opportunity to cross-examine witnesses or respond in writing to the credibility assessment. Id. ¶ 115.

Imparato's Final Investigative Report issued on October 15, 2021, and was identical to the Draft Report except that it added Plaintiff's observation about the photographs' date-stamps. Id. ¶¶ 117-18. Despite Plaintiff's response to the Draft report, the Final Report still characterized certain disputed facts regarding the sweater incident as undisputed. Id. ¶ 118.

## II.  Motion to Dismiss

### A. *Standard of Review*

In evaluating a motion to dismiss for failure to state a claim, the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

B.  *Discussion*

1.  Count V: Negligence

To state a negligence claim under Massachusetts law, a plaintiff must allege that: (1) defendants owed him a duty of reasonable care; (2) defendants breached this duty; (3) damage resulted; and (4) that damage was caused by the breach of duty. Doe v. Stonehill Coll., Inc., 55 F.4th 302, 338 (1st Cir. 2022). The burden of establishing each element, including the existence of a duty arising under Massachusetts law, lies with the plaintiff. Doe v. Amherst Coll., 238 F. Supp. 3d 195, 228 (D. Mass. 2017).

Here, Plaintiff claims that: (1) Brandeis and its employees owed duties of care to Plaintiff as a student, including a duty of reasonable care in conducting investigations and a duty to provide diligent, fair, impartial, and reasonable treatment of students; (2) those duties were breached when Defendants engaged in a biased and unfair investigation, decision, and sanctions process; (3) Plaintiff suffered damages; and (4) those damages were a direct and proximate result of Defendants' negligence. Compl. ¶¶ 197-200 [Doc. No. 1].

"[W]hether or not a duty of care exists is a question of law for the court." Doe v. Trs. Of Bos. Coll., 892 F.3d 67, 93-94 (1st Cir. 2018) (internal quotations and citation omitted). In Trustees of Boston College, the First Circuit squarely held that where school documents "prescribe [a] disciplinary process" that establishes a contractual relationship with its students, the school does not owe "any additional independent duty [in tort] outside of their existing contractual relationship." 892 F.3d at 94.

Plaintiff argues that Massachusetts case law following Trustees of Boston College suggests that the Supreme Judicial Court ("SJC"), if presented the instant question today, would reach a different conclusion than the First Circuit, and thus the question should be certified to the

SJC. Opp'n 9-10, 14-15 [Doc. No. 32]. The SJC has taken a nuanced approach to the question of duties between students and universities. In Helfman v. Ne. Univ., the SJC held that the "'distinctive relationship between colleges and their students'" creates a "'reasonable expectation, fostered in part by colleges themselves, that reasonable care will be exercised to protect resident students from foreseeable harm.'" 485 Mass. 308, 315-16, 149 N.E.3d 758 (2020) (quoting Mullins v. Pine Manor Coll., 389 Mass. 47, 56, 52, 449 N.E. 2d 331 (1983)). This "special relationship" is "not limited to a university's role as a landlord or property owner," but rather acknowledges the active role the modern university plays in many aspects of student life today. Id. In Helfman, the "special relationship" was applied to create a duty of care for universities to protect students from foreseeable alcohol-related harms. Id. at 321. Other Massachusetts cases relied on by Helfman also find a special relationship and corresponding duty of care between universities and their students in the context of foreseeable harms. See Dzung Duy Nguyen v. Mass. Inst. of Tech., 479 Mass. 436, 453, 96 N.E.3d 128 (2018) (finding special relationship between university and student and accompanying duty in context of preventing suicide); Mullins, 389 Mass. at 54 (finding duty for universities to protect their students against criminal acts of third parties).

A key element of these cases is whether the harm at issue was foreseeable to the university. Helfman, 485 Mass. at 315. "A university's duty to protect its students extends only to those harms which, based on an examination of all the circumstances, were reasonably foreseeable at the time." Id. at 322 (internal citations and quotations omitted). In Helfman, despite the existence of a special relationship, the court found no duty where the university had no "actual knowledge of conditions" that would subject the plaintiff to harm, such as imminent danger of serious physical harm due to intoxication and being so intoxicated that the plaintiff

could not ask for help. Id. at 321. In sum, Massachusetts courts considering whether a student has a tort claim against a university ask whether, within the context of the "special relationship" between students and universities, a university had knowledge of a foreseeable harm that might befall students sufficient to create a duty to those students to prevent that harm.

But regardless of these developments, the First Circuit has recently reiterated that the claims in a contractual disciplinary proceeding still sound in contract rather than tort. Stonehill Coll., 55 F.4th at 338 (quoting Bos. Coll., 892 F.3d at 94). To the extent that Plaintiff disagrees with this ruling, his request for certification should be directed to the First Circuit on appeal, rather than to this court, which is bound by the First Circuit's view of Massachusetts law.

Following First Circuit case law, this court concludes that Brandeis's disciplinary and investigative procedure outlined in its Formal Complaint Process creates a remedy in contract, not in tort, and Plaintiff's claim that Brandeis and its employees breached their duty of care to him in conducting the disciplinary process points to a breach of that contract, not negligence. See Compl., Ex. B (Formal Complaint Process) [Doc. No. 1-2]. Per First Circuit precedent, Plaintiff's general negligence claims fail.

The court notes further that even if it were to consider the developments in Massachusetts law, Plaintiff pleads no facts showing that Brandeis or its employees should have foreseen that Coe or MS would wrongly report the incident or mislead the investigation, or that Imparato and Jurado would conduct a flawed investigation, or other foreseeable harm that would implicate a duty of care. As such, even if this court could ignore First Circuit case law and find that Brandeis owed a duty of care to Plaintiff sufficient to sustain a negligence claim here, that claim would fail where Plaintiff has not alleged facts showing that the harm was foreseeable.

Accordingly, Count V of the Complaint is dismissed.

2.      Count VI: Negligent Infliction of Emotional Distress

Plaintiff alleges that he suffered severe emotional distress, including depression, anxiety, fear, inability to concentrate, sleep problems, and a lack of appetite as a result of Brandeis, Jurado, and Imparato breaching their duties of care to Plaintiff. "[O]ne must establish negligence to successfully set forth a claim for negligent infliction of emotional distress." Stonehill Coll., 55 F.4th at 338. Because Plaintiff has not stated a claim for negligence for the reasons discussed above, Plaintiff's claim of negligent infliction of emotional distress also fails. Count VI is dismissed.

### III.    Request for Leave to Amend

   A. *Standard of Review*

A party may amend its pleading once as a matter of course within 21 days of serving it, within 21 days of service of a motion to dismiss, or by leave of court, which "should be freely given when justice so requires." Fed. R. Civ. P. 15(a). But where a scheduling order is in place, "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Where the scheduling order sets deadlines for amending the pleading and a motion to amend is filed after that deadline, Rule 16(b)'s "good cause" standard, rather than Rule 15(a)'s "freely given" standard governs. See O'Connell v. Hyatt Hotels of Puerto Rico, 357 F.3d 152, 154-5 (1st Cir. 2004).

A motion for leave to amend may be denied on grounds other than timeliness, including futility of amendment. See Foman v. Davis, 371 U.S. 178, 182 (1962). When leave to amend is sought before discovery is complete and neither party has moved for summary judgment, futility is gauged by the same standard as legal sufficiency under Rule 12(b)(6). See Hatch v. Dep't for

Child., Youth & Their Fams., 274 F.3d 12, 19 (1st Cir. 2001); see also Bell Atl. Corp., 550 U.S. at 555, 570.

    B.    *Discussion*

Plaintiff has not filed a motion for leave to amend but, instead, has included in his opposition to the motion to dismiss a request for leave to amend. At the hearing on the motion, the court indicated that the request would be denied on procedural grounds. This result is warranted for several reasons. First, where a plaintiff's initial complaint is challenged by a motion to dismiss, the plaintiff is afforded an opportunity to amend as a matter of course within twenty-one days. Fed. R. Civ. P. 15(a)(1). That rule serves the purpose of allowing the legal issues framed by a pleading to be addressed altogether, not ad seriatim, as could result here where Plaintiff failed to file an amended complaint during the twenty-one day window. Second, the court's scheduling order required any motion to amend the pleadings to be filed by June 15, 2023. Plaintiff's request has not been timely filed as a motion and Plaintiff has offered no good cause to now allow Plaintiff to file a motion to amend outside of the scheduling order deadline. Finally, Plaintiff's request, included as part of his Opposition [Doc. No. 32] to Defendant's motion to dismiss, leaves the court to evaluate a possible amendment without the benefit of the proposed pleading.

Nonetheless, where the parties have addressed the merits of the request, the court considers further whether amendment would be futile.

    1.    Proposed Negligent Supervision Claim

To establish negligent supervision and training under Massachusetts law, a plaintiff must allege facts showing that (1) "the 'employer [became] aware or should have become aware of problems with an employee that indicated his unfitness'" and (2) "'the employer fail[ed] to take

further action such as investigating, discharge or reassignment.'" Stonehill Coll., 55 F.4th at 338 (citing Helfman, 485 Mass. at 326).[1] A claim of negligent supervision, unlike a general negligence claim, is not necessarily precluded by the contractual relationship between Plaintiff and Brandeis. See Doe v. Brandeis Univ., No. 20-cv-12162-AK, 2023 WL 1822785, at *12 (D. Mass. Feb. 8, 2023) (citing Brandeis Univ., 177 F. Supp. 3d at 613-14). But just as Plaintiff's Complaint [Doc. No. 1] does not allege facts showing the foreseeability of a false report or flawed investigation by Imparato and Jurado, the proposed amendment does not include facts showing that Brandeis knew or should have known of problems with Imparato and Jurado's ability to conduct Title IX investigations.

Plaintiff points to Brandeis Univ., where the court found it was "at least plausible" that a university had negligently appointed an employee to lead a disciplinary investigation. 177 F. Supp. 3d at 614. However, the allegations in that case included specific factual circumstances that could lead to an inference of unfitness for the role, including the defendant's unfamiliarity with the role, the fact that she never served as a final decision-maker before, and her selection as a decision maker only because the Dean of Students recused himself. Id. In contrast here, Plaintiff offers a conclusory allegation that Brandeis failed to provide Imparato with adequate training and failed to properly supervise her but offers no further facts to support this allegation. Compl. ¶ 39. Plaintiff's arguments that Imparato failed "to conduct a competent, diligent, and

---

[1] Massachusetts case law does not meaningfully distinguish between the torts of negligent supervision, retention, training, and hiring. "The torts of negligent hiring, retention, and supervision ordinarily relate to situations where 'employees are brought into contact with members of the public in the course of an employer's business.'" Doe v. Brandeis Univ., 177 F. Supp. 3d at 613. See Helfman, 485 Mass. at 326 (taking a negligent supervision and retention rule from Foster v. The Loft, Inc., 26 Mass. App. Ct. 289, 291 (1988) and applying it to a negligent supervision and training claim).

unbiased investigation" and "refus[ed] to correct objectively erroneous information in the Draft and Final Reports," Opp'n 18 [Doc. No. 32], do not point to failures with regard to her training or supervision. Although Plaintiff specified why Jurado should have known about Imparato's alleged incompetence, such as Jurado's participation in the investigation and her "habit" of revising reports, see Compl. ¶¶ 51-61, 146, Jurado's knowledge of Imparato's investigative process does not overcome Plaintiff's lack of specificity as to why Imparato was unfit for her employment. See Stonehill Coll., 55 F. 4th at 338 (dismissing negligent supervision claim where no specific facts alleged supporting broad allegations of "incompetence" by university employees); see also Brandeis Univ., 2023 WL 1822785, at *12 (granting summary judgment for university on negligent supervision claim where the facts plaintiff relied on stated a cause of action for breach of contract, not for negligence); Doe v. Williams Coll., 530 F. Supp. 3d 92, 123 (D. Mass. 2021) (granting summary judgement for college on negligent training and supervision claim where plaintiff's argument "is that the College's negligent training and supervision of [Defendants] denied him a fair disciplinary process, [which] the court finds [] to be a distinction without a difference" from general negligence claims).

Second, Plaintiff alleges that Brandeis improperly trained MS in her role as Community Advisor "and failed to supervise her to ensure she acted competently, fairly, without bias, and in compliance with Brandeis' policies and legal obligations." Compl. ¶ 34 [Doc. No. 1]. However, it is not pled with specificity how Brandeis or another supervisor was or should have become aware that there were problems with MS indicating unfitness for her role. Plaintiff alleges that MS's report exaggerated the actual events, but there are no facts demonstrating why Brandeis should have known that the report was exaggerated at the time it was made. Id. ¶ 35.

Finally, Plaintiff claims that Brandeis and Jurado failed to train MS and Imparato adequately because they underwent "trauma-informed" training, which resulted in MS and Imparato presuming that a female complainant's account of an incident must be true. Id. ¶ 163; Opp'n 18-19 [Doc. No. 32]. Defendants counter that following a certain training framework does not indicate that Defendants were trained improperly or that Brandeis or Jurado had reason to know of improper training. See Mem. Supp. Def. Mot. Dis. ("Def. Mem.") 14-15 [Doc. No. 21]. Other Massachusetts cases that have evaluated the implication of trauma-informed training for other university student-discipline cases have done so in the context of Title IX gender bias claims, not negligence. See, e.g., Williams Coll., 530 F. Supp. 3d at 116 (finding that trauma-informed training materials using gender-neutral language do not indicate bias).

In sum, Plaintiff offers no specific facts demonstrating that Imparato, Jurado, or MS was negligently trained or supervised by Brandeis. Accordingly, as proposed, the negligent supervision claim would be futile.

        2.        Proposed Defamation Claims against Imparato and Jurado

Finally, Plaintiff argues that Imparato's Final Report in the investigation "contained multiple false and defamatory statements of 'fact'" and requested leave in his Opposition to amend his complaint and add this defamation claim. Opp'n 15-16 [Doc. No. 32].

Plaintiff contends that Imparato's Final Report in the investigation "contained multiple false and defamatory statements of 'fact.'" Opp'n 16 [Doc. No. 32]. Plaintiff focuses on the report's statement that medical reports submitted by Coe during the investigative process "'indicate that [she] suffered a concussion and torn knee ligament due to the incident'… and that [he] 'did not dispute' that [Coe] had suffered these specific injuries." Id. Plaintiff claims that Coe's medical records "did not support the conclusion that [she] suffered a concussion or torn

16

knee ligament as a result of the incident…" but rather that "[Coe] herself reported she thought she had a torn ligament and concussion." Compl. ¶ 109 [Doc. No. 1]. He also alleges that this "dramatic exaggeration" of Coe's injuries was shared with multiple third parties, including the panel making the decision and the dean's office who imposed the ultimate sanctions on Plaintiff. Opp'n 16 [Doc. No. 32].

To establish a defamation claim, a plaintiff must show "(1) that the defendant made a statement concerning the plaintiff to a third party; (2) that the statement could damage the plaintiff's reputation in the community; (3) that the defendant was at fault in making the statement; and (4) that the statement either caused the plaintiff economic loss or is actionable without proof of economic loss." Brandeis Univ., 177 F. Supp. 3d at 615. However, "[s]tatements of opinion are not actionable under Massachusetts defamation law." Stonehill Coll., 55 F.4th at 339.

Plaintiff claims that because the medical record statements were written under the heading "undisputed facts" on Imparato's Final Report, they cannot be statements of opinion, and are thus actionable. Opp'n 17 [Doc. No. 32]. However, the test for determining whether a statement is one of fact or opinion "requires that the court examine the statement in its totality in the context in which it was … published." Stonehill Coll., 55 F.th at 339 (quoting Cole v. Westinghouse Broad. Co., 386 Mass. 303, 309, 435, N.E. 2d 1021 (1982)). Additionally, "the speaker can immunize his statement from defamation liability by fully disclosing the non-defamatory facts on which his opinion is based." Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir. 2015). Imparato's Report was a collection of her investigative findings, based on Coe's medical records, presented to the decision-making panel as Imparato's interpretation of events. Taken in

the context of the investigative report as a whole, the statement was an opinion and cannot support a defamation claim.

In sum, where Plaintiff has not demonstrated that the allegedly defamatory statements are actionable, the court finds that amending the complaint would be futile. Accordingly, the court finds no cause to allow further amendment, and Plaintiff's request to amend is DENIED.

### IV.   Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss [Doc. No. 20] Counts V and VI of the Complaint is GRANTED and Plaintiff's request to amend his Complaint to include negligent supervision and defamation claims are DENIED.

IT IS SO ORDERED

February 22, 2024                                             /s/Indira Talwani
                                                              United States District Judge